RONALD E. HALVORSEN, Respondent-Appellant, v FORD MOTOR COMPANY et al., Appellants-Respondents, et al., Defendant. (Action No. 1.)

DOROTHY A. GRADY, as Administratrix of the Estate of MARK J. GRADY, Deceased, Respondent, v FORD MOTOR COMPANY, Appellant, and NATIONAL RAILWAY UTILIZATION CORPORATION et al., Respondents, et al., Defendant. (Action No. 2.)

Third Department, December 3, 1987

---

## APPEARANCES OF COUNSEL

*Damon & Morey (George M. Gibson* of counsel), for Ford Motor Company.

*Leonard, Mellon & Gebo (A. Michael Gebo* of counsel), for National Railway Utilization Corporation, respondent.

*Poissant, Twiss & Nichols, P. C. (Joseph M. Poissant* of counsel), for respondent-appellant.

*Robert J. Sassone* for Dorothy A. Grady, respondent.

### OPINION OF THE COURT

HARVEY, J.

In the early morning hours of January 28, 1980, plaintiff Ronald E. Halvorsen (hereinafter Halvorsen) and Mark J. Grady (hereinafter decedent), together with some of their friends, left a bar in the Village of Norwood, St. Lawrence County, intent upon proceeding to another location where they planned to continue their festive activities. Halvorsen rode as a passenger in decedent's 1971 Ford Bronco as decedent drove north along Route 56 toward the Town of Norfolk, St. Lawrence County. Neither occupant utilized the vehicle's seat belts. The weather was characterized as good, although there was approximately one inch of snow on the road. There was evidence that the vehicle was traveling at about 35 to 40 miles per hour and that decedent's blood alcohol content was .16%.

A short distance outside of Norwood, there was a railroad track which crossed Route 56. The railroad crossing was maintained by defendant National Railway Utilization Corporation and its subsidiary, defendant St. Lawrence Railroad (hereinafter collectively referred to as the Railroad). There was testimony that, as the Bronco crossed the tracks, it began to drift into the opposite lane of traffic. Decedent purportedly tried to steer the vehicle back to the right but was unable to do so. The Bronco continued to drift to the left where it made contact with a guardrail located 265 feet north of the crossing. The vehicle then proceeded into a parking lot of defendant Barrett Paving Materials, Inc. (hereinafter Barrett), where it struck a caterpillar front-end loader which was parked there. Decedent suffered fatal injuries and Halvorsen was rendered a quadraplegic.

The instant lawsuits followed. In action No. 1, Halvorsen sued defendant Ford Motor Company (hereinafter Ford), the Railroad, Barrett and the administratrix of decedent's estate, Dorothy A. Grady (hereinafter Mrs. Grady). Mrs. Grady commenced action No. 2 on behalf of decedent's estate against

Ford, the Railroad and Barrett. A discontinuance with prejudice was consented to by all the parties with regard to the actions against Barrett. Following approximately six weeks of trial, the jury rendered its verdicts. In action No. 1, the jury awarded Halvorsen a total of $2,400,000 in damages. Liability was assessed as follows: Ford—45%; the Railroad—30%; decedent—10%, and Halvorsen—15%. The jury reduced the verdict by $360,000 for Halvorsen's failure to use an available seat belt. In action No. 2, Mrs. Grady was awarded $600,000 and responsibility was apportioned as follows: Ford—45%; the Railroad—30%, and decedent—25%. The verdict was reduced by $60,000 for decedent's failure to use an available seat belt.

Ford and the Railroad made various posttrial motions. All posttrial motions with respect to action No. 1 were denied. In action No. 2, however, Supreme Court granted that part of the motions challenging the verdict as excessive. Accordingly, the court directed that the verdict of $600,000 in this action be set aside unless Mrs. Grady stipulated to a reduction of the verdict to $150,000, with appropriate reductions for decedent's contributory negligence and a reduction of $15,000 for decedent's failure to wear a seat belt. Mrs. Grady so stipulated, and a judgment of $97,500 was thus entered in action No. 2. These appeals by Mrs. Grady, Ford and the Railroad ensued.

We turn first to the argument that the jury's verdicts were against the weight of the evidence. In determining whether the original trier of fact incorrectly assessed the evidence, great deference is given to a jury's interpretation of the evidence (*Rapant v Ogsbury,* 279 App Div 298, 299). Findings of fact that have sufficient support in the credible evidence will not be disturbed even if there is evidence leading to a contrary conclusion (*Le Bel v Airlines Limousine Serv.,* 92 AD2d 996, 997; *Matter of Cristo,* 86 AD2d 700, 701). In order for a verdict to be set aside, it must be shown that the preponderance of the evidence is so greatly contrary to the jury's verdict that it could not have been rendered by any fair interpretation of the evidence (*Rowe v Board of Educ.,* 120 AD2d 850, 851, *lv denied* 68 NY2d 609; *Fortin v Marra,* 116 AD2d 786, 787).

The theory of Mrs. Grady and Halvorsen at trial was that there was a depression or series of holes where the railroad tracks cross the highway and that this triggered a design defect in the steering system of the Bronco. The testimony of two individuals was crucial to this theory. Harley F. Copp, a former engineer for Ford, opined that there was a defect in

the Bronco's steering system which could be triggered by a depression or bump of three inches or more. Paul Hall, a former employee of the Railroad who frequently traveled over the crossing, testified that the macadam was broken on both sides of the crossing. Hall testified that there were a series of holes on the south side of the crossing, some of which were 4 to 6 inches deep.

■ The Railroad and Ford assert that Hall's testimony was incapable of belief when weighed against other testimony and photographs of the scene. Although most of the evidence indicated that only minor depressions existed in the macadam, the evidence presented was not so authoritative as to require this court to conclude that the jury's decision to credit Hall's testimony was unreasonable. Faced with conflicting testimony, it was for the jury to assess credibility.

As to Copp's testimony that the design defect that caused the Bronco to turn to the left was triggered by a depression at the crossing, Ford contends that this testimony was inconsistent with the physical facts existing at the accident scene. Ford points out that Thaddeus Coller, one of the first persons at the accident scene, and St. Lawrence County Sheriff Robert Denner both testified that they saw tire tracks in the snow that went left into the southbound lane *before* the vehicle reached the railroad crossing. It is thus contended that the condition of the railroad crossing could not have triggered the purported defect. However, Denner's testimony was impeached by a prior signed statement in which he stated that the Bronco first entered the southbound lane about 25 feet *north* of the railroad crossing. As for Coller, there was testimony that the ambulances had traveled in and out of the accident site and that he might have confused their tracks with those of the Bronco. There was sufficient evidence for the jury to determine that the vehicle did not enter the left lane prior to crossing the tracks.

Ford also attempts to discredit Copp's testimony because he stated that a "bump" would make the Bronco veer left. Ford points out that the vehicle traveled through a purported hole or depression and not over a bump. Copp's testimony, however, makes it clear that the word "bump" was used in a technical sense, referring to when the maximum load is on the front wheels. It could thus reasonably be construed to describe the reaction of a vehicle passing through a hole or depression. Consequently, we conclude that the jury's acceptance of the theory that a depression in the road at the

railroad crossing triggered a design defect which made decedent unable to steer the Bronco was not against the weight of the evidence.

Supreme Court's charge adequately explained to the jury those elements necessary for determination of the issues of negligence and products liability. The trial of this matter lasted six weeks and the jury was confronted with complicated issues and conflicting testimony. While we may have resolved the issues differently, we are constrained to uphold the verdict since it cannot be said that it was not supported by any fair interpretation of the evidence *(see, Rowe v Board of Educ.,* 120 AD2d 850, *supra; Pfohl v Wipperman,* 41 AD2d 891, *affd* 34 NY2d 597).

■ We consider next Halvorsen's contention that the jury should not have been allowed to consider his culpable conduct in riding with decedent. We find this contention unpersuasive. There was evidence that decedent's blood alcohol content was .16%, a very high level. Decedent and Halvorsen had purchased more beer before embarking on their journey and empty beer bottles were found in the back of the vehicle immediately after the accident. Under these circumstances, the issue was properly before the jury as to whether, in the exercise of reasonable care, Halvorsen should have been aware of decedent's intoxication *(see,* 8 NY Jur 2d, Automobiles, § 683, at 361).

■ Ford argues that there were inherent inconsistencies in the jury's verdicts. It is pointed out, for example, that the jury's determination in action No. 1, that Halvorsen was 15% culpable because he rode with an intoxicated individual, cannot be logically reconciled with the further determination in that action that the intoxicated driver, decedent, was only 10% culpable. It is, indeed, difficult to discern how a passenger's culpability for assuming the risk of riding with an intoxicated individual can exceed the culpability of the intoxicated driver. However, Ford's failure to raise this issue before the jury was discharged resulted in the issue being waived *(see, Barry v Manglass,* 55 NY2d 803, 805-806).

■ Ford contends that the reductions in the verdicts for failure to wear seat belts were inadequate considering the uncontroverted expert testimony. We cannot agree. Nonuse of an available seat belt, and expert testimony in regard thereto, are merely factors that the jury may consider in light of all the other evidence in determining damages *(see, Spier v*

*Barker,* 35 NY2d 444, 449-450). The jury is not required to wholly adopt the opinion of an expert, even though uncontradicted *(see, Felt v Olson,* 74 AD2d 722, 723, *affd* 51 NY2d 977).

■ Finally, Mrs. Grady requests, pursuant to CPLR 5501 (a) (5), that the original jury verdict in her favor of $600,000 be restored. The original verdict, however, was excessive. The proof at trial showed that decedent's projected loss of earnings would be $482,000. This figure included neither a reduction for present value nor any reduction for personal consumption or expense. As noted by Supreme Court, even the most generous son could not reasonably be expected to give his mother more than he earned in his lifetime. Further, Mrs. Grady testified that her son made no significant monetary contribution to the household prior to his death. Consequently, there is no reason to disturb Supreme Court's judgment in this matter.

The remaining contentions have been considered and found to be unpersuasive.

CASEY, J. P., WEISS, MIKOLL and YESAWICH, JR., JJ., concur.

Judgments and order affirmed, without costs.