GERARD A. POLLICINA, as Administrator of the Estate of BARBARA A. POLLICINA, Deceased, Appellant, v MISERICORDIA HOSPITAL MEDICAL CENTER et al., Defendants, and HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF MEDICINE, Respondent.

First Department, June 28, 1990

## APPEARANCES OF COUNSEL

*Theodore H. Friedman (Norman E. Frowley* on the brief), for appellant.

*Nancy Ledy-Gurren* of counsel *(Craig W. Lensch* and *Karen L. Hymowitz* with her on the brief; *Bower & Gardner,* attorneys), for respondent.

## OPINION OF THE COURT

Ross, J.

The primary issue presented by this appeal is whether the trial court erred in setting aside a jury verdict, which found that, as a result of performing a June 9, 1976 blood test on Mrs. Barbara Ann Pollicina, defendant Hospital of the Albert Einstein College of Medicine was proximately responsible for injury to and the death of Mrs. Pollicina.

While pregnant, Mrs. Pollicina, who was approximately 24 years old, on November 12, 1975 was admitted to the Hospital of the Albert Einstein College of Medicine (Einstein Hospital), by Drs. Stephen F. Allen and Peter George Mancuso, her private attending obstetricians, for treatment of acute gastroenteritis, and she was discharged on November 15, 1975.

Thereafter, as a result of an admission by Drs. Allen and Mancuso, upon the basis that Mrs. Pollicina was suffering from preclampsia, which is an abnormal condition of pregnancy characterized by hypertension and edema, she was a patient in that hospital from April 27, 1976 to May 13, 1976. During this hospital stay, Drs. Allen and Mancuso consulted with Dr. Simeon Pollack, a private attending hematologist. In a consultation note of May 4, 1976, Dr. Pollack ordered a

number of blood tests, and suggested that a postpartum IVP, which is an intravenous pyelogram, be performed on the patient, in order to rule out secondary, as opposed to familial, polycythemia. Further, in his note, Dr. Pollack cautioned that "before doing an intravenous pyelogram consult Wolf."

Dr. Wolf is a hematologist, who had previously studied the blood condition of Mrs. Pollicina and her brothers. It is undisputed that Mrs. Pollicina had a long-standing history of familial polyothemia, which is a disorder characterized by thicker than normal blood, resulting in a greater risk of dangerous blood clotting.

Subsequently, on May 27, 1976, Drs. Allen and Mancuso admitted Mrs. Pollicina to Einstein Hospital for possible induction of labor, due to intrauterine growth retardation. Thereafter, Dr. Mancuso, assisted by Dr. Roger Duvivier, who was a resident, performed a Caesarean section, and a healthy female infant was delivered. While Mrs. Pollicina was recuperating in Einstein Hospital, Dr. Mancuso, acting on Dr. Pollack's suggestion, and since he desired to know if Mrs. Pollicina had any inherent kidney disease, ordered an IVP to be done. This IVP was accomplished by injecting dye into Mrs. Pollicina's right arm. After completion of the IVP procedure, on June 4, 1976, Mrs. Pollicina was discharged.

Four days later, on June 8, 1976, Dr. Mancuso saw Mrs. Pollicina in his office, and, at that time, *inter alia,* she was physically examined by him, but no blood tests were taken, and he observed no swelling or phlebitis at the site of the IVP on her arm.

The next day, June 9, 1976, Mrs. Pollicina went to Einstein Hospital, as she had done every day after her discharge on June 4th, in order to feed her infant, who had remained hospitalized, since that child was underweight. Before us there is documentary evidence, consisting of an Einstein Hospital special hematology laboratory report which reflects that, on June 9th, a blood test had been performed on Mrs. Pollicina.

Due to a swelling on her right arm, on June 11, 1976, Mrs. Pollicina saw Dr. Allen, in his office, and he referred her to Dr. Leonard Benjamin DiRe, a specialist in internal medicine, at Misericordia Hospital Medical Center (Misericordia). Although Dr. DiRe examined her, he did not admit her to that hospital. Dr. DiRe diagnosed cellulitis and/or phlebitis, and recommended that she keep her arm elevated and apply hot soaks.

Later in the evening of that day, Mrs. Pollicina returned to Misericordia, complaining of swelling and pain in her arm. In response, an emergency room resident telephoned Dr. Allen, who directed the resident to refer Mrs. Pollicina to Dr. Nicholas Anthony Balsano, a vascular surgeon on service at that hospital. After examining Mrs. Pollicina, Dr. Balsano diagnosed her condition as, in substance, "thrombophlebitis, right upper arm with cellulitic component; polycythemia vera, venous obstruction." Upon the basis of that diagnosis, Mrs. Pollicina was admitted to Misericordia for treatment. When Dr. Allen visited her on June 12th, Mrs. Pollicina expressed to him her fear that her arm would be "cut off", and she told him that she wanted to be treated at Einstein Hospital, by Dr. Leone, who was her private internist.

Thereafter, on June 12th, against medical advice, Mrs. Pollicina signed herself out of Misericordia. Since Dr. Allen had been advised that no surgical or medical beds were available in Einstein Hospital, he had Mrs. Pollicina admitted to the obstetrical service, as his private patient. Following this admission, Dr. Allen instructed Dr. Duvivier, a resident on the obstetrical service, and an admitting note indicated, that a medical consult was to be done concerning the use of Heparin to treat Mrs. Pollicina's right arm. Since Dr. Duvivier left the hospital's employ the next day, another resident noted in a hospital record that "Dr. Leone (a physician selected by Mrs. Pollicina) to be consulted as to treatment and possible anticoagulation."

In view of the fact that Dr. Leone was not available during the period, from June 13-16, of Mrs. Pollicina's hospitalization, Dr. Frank M. Sandor, the attending physician who was covering for Dr. Leone, performed the medical consult, mentioned *supra.* While Mrs. Pollicina was hospitalized, she was neither treated with anticoagulants, nor did Dr. Sandor ever make the clinical judgment that a vascular surgeon was needed.

On June 19th, which was three days after her discharge from Einstein Hospital, Mrs. Pollicina returned, complaining of shortness of breath, fell into cardiac arrest, and succumbed, later that day, to suffocation, since her lungs had become filled with blood clots.

In October 1977, Mr. Gerard Anthony Pollicina (plaintiff), as administrator of the goods, chattels, and credits of his deceased wife (decedent), commenced a medical malpractice action against Misericordia, Drs. Mancuso, Allen Balsano,

Sandor, Ms. Maria T. DiRe, as executrix of the estate of Dr. DiRe, Dr. Duvivier, and Einstein Hospital (defendants) for damages, in the Supreme Court, Bronx County. The complaint alleges, in substance, that the negligence of the defendants resulted in the wrongful death of decedent.

Following the joinder of issue, a six-week trial took place. At the end of the plaintiff's case, the trial court granted motions to dismiss the complaint against defendants Misericordia, and Drs. Balsano and DiRe.

Further, the jury returned a verdict in favor of plaintiff against defendants Drs. Allen, Mancuso, and Sandor, and Einstein Hospital in the amount of $5,000,000; and said verdict allocated the liability as follows: Dr. Sandor 50%, Einstein Hospital 25%, Dr. Mancuso 13%, and Dr. Allen 12%. Also, the jury found no liability against defendant Dr. Duvivier.

Subsequently, the trial court, *inter alia,* granted defendant Einstein Hospital's motion to set aside the verdict of liability against it, and further, the court reduced the amount of the verdict to $2,200,000. Plaintiff appeals.

Before us, plaintiff contends, in substance, that the trial court erred in setting aside the verdict of liability against defendant Einstein Hospital, and in reducing the size of the verdict.

The jury found defendant Einstein Hospital 25% liable, upon the basis of two separate theories, as follows: (1) the hospital departed from acceptable medical standards by, on June 9, 1976, performing a blood test on the decedent, and (2) the hospital departed from acceptable medical standards with respect to its residents' failure to recommend consultation by a vascular surgeon on June 12, or June 13, 1976.

After our examination of the record, we agree with the trial court's setting aside that part of the liability verdict against Einstein Hospital, concerning the failure of that hospital's residents to recommend, on June 12 or June 13, a consultation by a vascular surgeon, since we find that Einstein Hospital incurred no liability for not intervening in the relationship between decedent and her private physicians. It is well-established law that a hospital is protected from tort liability, when *its* professional staff follows the orders of private physicians selected by the patient *(Toth v Community Hosp.,* 22 NY2d 255, 265 [1968], *rearg denied* 22 NY2d 973 [1968]; *Killeen v Reinhardt,* 71 AD2d 851, 853 [1979]). The

exception to that rule, which we do not find applicable to the facts herein, is "where the hospital staff knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" *(Toth v Community Hosp., supra,* at 265, n 3).

■ However, as to the remaining theory of liability found against Einstein Hospital, concerning the June 9th blood test, we reach a different conclusion, based upon our analysis *infra,* and find that the trial court erred in setting aside that part of the verdict.

More than 30 years ago, the Court of Appeals in *Bing v Thunig* (2 NY2d 656, 667 [1957]) held that "[t]he hospital's liability must be governed by the same principles of law as apply to all other employers". Imposition of vicarious liability upon employers, such as Einstein Hospital, rests upon public policy considerations, in that it is fairer to allocate "[t]he risk * * * to the employer because it is better able than the innocent plaintiff to bear the consequences of employees' torts, and by the imputation of liability is also encouraged to act carefully in the selection and supervision of its employees" *(Kavanaugh v Nussbaum,* 71 NY2d 535, 546 [1988]).

Repeatedly, appellate courts in this State have held that a jury verdict should not be disturbed, unless that verdict cannot be "supported by any fair interpretation of the evidence" *(Halvorsen v Ford Motor Co.,* 132 AD2d 57, 62 [1987]; *Muth v J & T Metal Prods. Co.,* 74 AD2d 898 [1980], *lv dismissed* 51 NY2d 745 [1980]; *Pfohl v Wipperman,* 41 AD2d 891 [1973], *affd* 34 NY2d 597 [1974]). In other words, "[h]owever much a trial court may disagree with a jury verdict, if the verdict is one which reasonable men could have rendered after reviewing conflicting evidence the court may not substitute its personal judgment in place of the verdict" *(Muth v J & T Metal Prods. Co., supra).*

In *Schneider v Kings Highway Hosp. Center* (67 NY2d 743 [1986]), the plaintiff administratrix commenced an action to recover damages for injuries sustained by the decedent, who allegedly fell out of a bed in defendant hospital, as a result of the negligence of hospital staff in failing to keep bed rails raised on her bed. The plaintiff in the case relied upon circumstantial evidence to prove defendant's negligence, and, in holding that the plaintiff had made out a prima facie case, the Court of Appeals stated, in pertinent part *(Schneider v*

*Kings Highway Hosp. Center, supra,* at 744): "To establish a prima facie case of negligence based wholly on circumstantial evidence, '[i]t is enough that [plaintiff] shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred' *(Ingersoll v Liberty Bank,* 278 NY 1, 7). The law does not require that plaintiff's proof 'positively exclude every other possible cause' of the accident but defendant's negligence *(ibid.* [quoting *Rosenberg v Schwartz,* 260 NY 162, 166]). Rather, her proof must render those other causes sufficiently 'remote' or 'technical' to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence".

There is no requirement that the plaintiff, in order to make out a prima facie case, prove the precise nature of the defendant's negligence *(Markel v Spencer,* 5 AD2d 400 [1958], *affd* 5 NY2d 958 [1959]). Further, in determining the adequacy of the evidence presented by the plaintiff, a court must consider same "in the light most favorable to plaintiff" *(Schneider v Kings Highway Hosp. Center, supra,* at 745). Also, since this is an action for wrongful death, "a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself [or herself] describe the occurrence" *(Noseworthy v City of New York,* 298 NY 76, 80 [1948]; *Lyons v De Vore,* 39 NY2d 971 [1976]).

Plaintiff's circumstantial evidence of defendant's negligence consists of testimony and documents, which indicate, in substance, that on June 4th, an IVP was performed on decedent's right arm, shortly before she was discharged from Einstein Hospital after the birth of her baby; decedent's mother testified that she was waiting in the hospital to drive her daughter home when the IVP was performed, and after completion of same, her daughter was holding her right arm, and stated "Look what they did", and, at that time, decedent's mother observed that decedent's arm "was already black and blue from the [IVP] needle"; further decedent's mother testified that, in the next day or two, after the IVP, she observed that decedent's arm was swollen; subsequent to her leaving the hospital on June 4th, decedent returned there each day thereafter, up to and including June 9th, to feed her underweight baby; an Einstein Hospital hematology report indicates that a blood sample taken from decedent's right arm, was analyzed in that hospital on June 9th; Drs. Allen and Mancuso denied in their testimony any knowledge of the June 9th blood test;

on June 11th, Dr. Allen testified that decedent complained of swelling on her right arm, and he referred her to Dr. DiRe, a specialist in internal medicine at Misericordia, who after examining her, diagnosed cellulitis and/or phlebitis; decedent's condition continued to decline; and, on June 19th, she died, as a result of suffocation, her lungs having filled with blood clots.

Dr. Harold Smith, who testified as a medical expert for plaintiff, stated, in pertinent part that the June 9th blood test "caused an acute flareup of the phlebitis that was already in the vein [from the IVP] and that is why there was marked swelling and symptomatology noted in that right arm starting from the point shortly after that needle was placed to do the * * * test".

Defendant Einstein Hospital speculates that the blood for the June 9th blood test, which is reflected in its own hematology laboratory report, may have been drawn from decedent's right arm by an unknown physician, not affiliated with Einstein Hospital and whose office was located outside that hospital, and thereafter that blood was sent to defendant for analysis. However, defendant does not support its theory with any positive evidence, such as that Einstein Hospital's hematology laboratory engaged in the practice of analyzing blood which was taken outside of the hospital's premises by persons not affiliated with that hospital. And further, such theory is pure speculation.

We find that the evidence in the record clearly indicates that, since decedent had confidence in Drs. Allen and Mancuso, her primary private attending physicians, it is highly unlikely that she would have established a new relationship, during the approximately two-week period extending from June 4th to the day of her death, with a new physician, who was unknown to Drs. Allen and Mancuso.

Further, we find on the evidence before the jury, said jury could find that, considering decedent's hereditary blood disorder, which made her susceptible to dangerous blood clotting, that it was a departure from accepted medical standards to draw from her, and that same was done on June 9th, only five days after the IVP had been performed on the same arm.

Upon the basis of the plaintiff's evidence, we find that there was a valid line of reasoning and permissible inference, which could lead rational persons to the conclusion reached by the jury, the defendant Einstein Hospital was liable for the June

9th test *(Cohen v Hallmark Cards,* 45 NY2d 493, 499 [1978]). In other words, the jury could have inferred, from the circumstantial evidence before them, that a nurse, physician, technician, or other member of defendant's staff who knew decedent from her frequent hospitalizations, decided that her medical records indicated that she needed a blood test, and performed same on June 9th, and as Dr. Duvivier testified said test may have been ordered verbally.

In summary, we find no justification for the trial court to have set aside the finding of liability against Einstein Hospital *(Cohen v Hallmark Cards, supra; Halvorsen v Ford Motor Co., supra; Muth v J & T Metal Prods. Co., supra).*

We have examined the other contentions of the parties and find them to be without merit.

Accordingly, judgment, Supreme Court, Bronx County (Jack Turret, J., and a jury), entered November 29, 1988, which, *inter alia,* following a jury verdict in favor of plaintiff in the amount of $5,000,000 and allocating liability among several defendants, including defendant Hospital of the Albert Einstein College of Medicine (Einstein Hospital), the trial court, *inter alia,* set aside the verdict of 25% liability against Einstein Hospital, and reduced the amount of the verdict in favor of plaintiff to $2,200,000, should be unanimously modified, on the law, and on the facts, to the extent of reinstating the jury verdict of 25% liability against Einstein Hospital, and, except as so modified, otherwise affirmed, without costs.

SULLIVAN, J. P., KASSAL and WALLACH, JJ., concur.

Judgment, Supreme Court, Bronx County, entered on November 29, 1988, unanimously modified, on the law and on the facts, to the extent of reinstating the jury verdict of 25% liability against Einstein Hospital, and, except as so modified, otherwise affirmed, without costs and without disbursements.