Marjorie DATSKOW, Executrix of the Estates of Robert C. Gross and Susan C. Gross, deceased, and Administratrix of the Estates of Michael and David Gross, deceased, and Grossair, Inc., Plaintiffs,

v.

TELEDYNE CONTINENTAL MOTORS AIRCRAFT PRODUCTS, A DIVISION OF TELEDYNE INDUSTRIES, INC., Defendant.

No. 88–CV–1299L.

United States District Court,
W.D. New York.

July 15, 1993.

See also 807 F.Supp. 941.

Arthur Alan Wolk, Philadelphia, PA, for plaintiffs.

Stephen R. Stegich, III, Stuart Robinowitz, New York City, Michael Kelly, Los Angeles, CA, for defendants.

DECISION AND ORDER

LARIMER, District Judge.

## BACKGROUND

This products liability case arises out of the crash of a private airplane in which four people were killed. Plaintiffs sued the manufacturer of the engine on the theory that a defect in the plane's engine caused the crash.

On February 24, 1993, after a month-long trial, a jury returned a verdict in plaintiffs' favor on theories of strict liability, negligent design, and failure to warn. The jury awarded the following damages: $250,000 to Juletta Cook, the mother of one of the decedents, on her wrongful death claim for economic loss; $5000 for funeral expenses; $30,000 to plaintiff Grossair, Inc., the owner of the plane, for loss of the aircraft, and a total of $107,000,000 for conscious pain and suffering of the decedents.

Defendant, Teledyne Continental Motors Aircraft Products ("TCM"), has filed a motion seeking three alternative types of relief: to set aside the jury verdict and enter judgment in TCM's favor under Fed.R.Civ.P. 50(b); for a new trial pursuant to Rule 59; or for remittitur of damages under Rule 59.

Plaintiffs have also filed two motions. First, in the event that the court grants defendant's motion for a new trial or for remittitur, plaintiffs request that the court apply North Carolina law. Second, plaintiffs move to strike two affidavits submitted by defendant in support of defendant's motion.

## DISCUSSION

TCM's motion is lengthy (204 pages including reply brief plus exhibits) and raises virtually every issue that was disputed during the month-long trial. Although I have carefully considered the many arguments made by TCM, there are only a few that merit discussion.

Many of TCM's issues, especially concerning evidentiary matters, are issues that were discussed at length during the trial. As to these matters, this motion is nothing more than an attempt to reargue issues upon which I ruled against TCM—no matter how inconsequential relative to the final verdict. As to these evidentiary issues, I made rulings and gave reasons, often extensive ones, for ruling as I did. Nothing would be served by my repeating those rulings in this written decision. I made my rulings and gave reasons for those rulings; I stand by them and see no basis to "change" those rulings now.

Nothing advanced by TCM now persuades me that I should have ruled differently relative to disputed issues at trial. In addition, none of TCM's arguments, whether considered separately or as a whole, warrants either granting judgment in TCM's favor or granting a new trial on liability. As to damages, however, I do find the verdict to be excessive in several respects and I grant a new trial on damages, unless plaintiff accepts a remittitur of the excessive portion of the jury verdict.

*I. Issues Relating to Liability*

 1. Defendants' Motion for Judgment as a Matter of Law

 Defendant has moved to set aside the jury verdict and to enter judgment in its

favor under Fed.R.Civ.P. 50(b). In support of the motion, defendant argues that plaintiffs failed to adduce sufficient evidence that the engine was defective or that a defect in the engine caused the fatal crash. In particular, defendant contends that there was no evidence of an obstruction in the engine's fuel line or that there was an in-flight fire.

The standard for deciding a Rule 50(b) motion "is appropriately strict." *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir. 1988). The court must determine whether the evidence, viewed in the light most favorable to plaintiffs, was sufficient to have allowed a reasonable juror to arrive at a verdict for plaintiffs. *Konik v. Champlain Valley Physicians Hosp.*, 733 F.2d 1007, 1013 (2d Cir.1984). The court must draw all reasonable inferences in plaintiffs' favor, and all questions of credibility must likewise be decided in plaintiffs' favor. *Id.*

The Second Circuit has cautioned that in making these determinations, "the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 (2d Cir.1980). Rather, the court should grant the motion "only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Id.* at 167–68.

Defendant has not met this burden. Essentially, TCM seeks to "reargue" the case to the jury. There was conflicting proof and the jury determined the factual issues against TCM on all points. In this type of case, when the four principal eyewitnesses to the crash—the Gross family—were killed, plaintiffs had to rely on circumstantial evidence and expert testimony to make the case. In my view, the direct and circumstantial evidence together with all of the expert testimony provided more than sufficient evidence for the jury to have found against TCM on each of the three grounds for liability—strict products liability, negligent design, and failure to warn—that form the basis for the jury verdict. The evidence at trial was extensive on both sides and was in sharp conflict. Although a full recitation of all the evidence is neither practicable nor necessary here, I note that plaintiffs presented both eyewitness and expert testimony. The latter included testimony by Donald Sommer, a mechanical engineer with a background in accident reconstruction. Sommer opined that a fuel nozzle inside the engine had become clogged, causing fuel to leak out and catch fire during the flight. He based this opinion on examinations and tests of the actual engine and of mock-up or model engines. He explained the basis for his opinion to the jury through his testimony, and by means of videotaped experiments and courtroom demonstrations.

Sommer further testified that, in his opinion, there was an alternative design available for the engine, referred to as an "upper deck" system, which he said would have avoided the fire which occurred here. Tr. 833. There was evidence that such a system was in fact used by Teledyne for its turbocharged engines, and in Sommer's opinion it was feasible for the engine involved in this case.

Much of defendant's attack on the sufficiency of the evidence is really an attack on the qualifications of Sommer, whom defendants derisively refer to as "a so-called 'accident investigator,'" "putative expert," "accidentologist," and "a professional witness who makes a living by devising possible scenarios for accidents long after the fact." Def. Memo. p. 11.

To the extent that defendant is challenging the qualifications of Sommer, or any other of plaintiffs' experts for that matter, those qualifications were amply set forth in the record. The basis for my allowing these witnesses to testify as experts is also clearly reflected in the trial transcript, and I see no need to repeat my rulings in that regard here.[1]

---

**1.** Defendant's contention that the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), supports defendant's asser-

■ In addition, if defendant is suggesting that testimony by an expert in accident reconstruction is *per se* improper, its position is untenable. Accident reconstruction experts are frequently used in trials, and their testimony can support a verdict. *See, e.g., Hinds v. General Motors Corp.,* 988 F.2d 1039, 1042–43 (10th Cir.1993); *Harrison v. Sears, Roebuck and Co.,* 981 F.2d 25, 28 (1st Cir. 1992); *Caiazzo v. Volkswagenwerk A.G.,* 647 F.2d 241, 248 (2d Cir.1981).

Furthermore, defendant itself used its own accident reconstruction expert, Terrence Heaslip. Like Sommer, he testified about a wide variety of subjects, including fire damage, radiography, the airplane's flight path, and tree limbs that had allegedly been severed by the plane's propeller.

In fact, much of the expert testimony offered by defendant was plainly meant to counter that offered by plaintiffs. Like plaintiffs, defendant called witnesses who offered opinions on fire, weather conditions, piloting an aircraft, the cause of death, and so on.

That defendant would want to rebut plaintiffs' experts' opinions is not surprising, of course. The point is that the jury heard a wealth of expert testimony (Sommer's alone took the better part of five days), and it was the jury's province, not the court's, to decide the weight to be given that testimony. *Caiazzo,* 647 F.2d at 248; *Mattivi,* 618 F.2d at 167.

Plaintiffs also called Patrick McGinley, an expert in fire investigation. He concluded from his examination of the airplane wreckage that a fire began in the engine while the plane was still in flight, not after the plane hit the ground or trees. Tr. 1942. His testimony was largely consistent with, and corroborative of, Sommer's opinion that the fire had resulted from leaking fuel. Tr. 1946–47.

In addition, there was evidence that the particular engine in the crash aircraft had a long history of problems, including fuel leaks. This evidence supported plaintiffs' theory that the engine had been defectively and negligently manufactured. Tr. 931.

Again, it is unnecessary to recite all the evidence here. Suffice it to say that the evidence was more than adequate to present the jury with issues of fact on plaintiffs' various theories of liability. Defendant's motion for judgment as a matter of law must therefore be denied. *Konik,* 733 F.2d at 1013.

### 2. Defendant's Motion for a New Trial on All Issues

■ Defendant has moved for a new trial on all issues pursuant to Fed.R.Civ.P. 59. One of the grounds for this motion is that the verdict is against the weight of the evidence, for the same reasons put forward with respect to the Rule 50(b) motion.

■ The standard for granting a new trial under Rule 59 is less strict than that for judgment as a matter of law under Rule 50(b), for "a new trial motion may be granted even if there is substantial evidence to support the verdict." *Bevevino v. Saydjari,* 574 F.2d 676, 683 (2d Cir.1978). Nevertheless, the mere fact that the trial judge may have reached a different result than the jury is not a sufficient reason to grant the motion; the court should "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." *Id.* at 684 (quoting 6A J. Moore, Moore's Federal Practice ¶ 59.08[5] ).

I do not believe that TCM has made the required showing to warrant a new trial. As the preceding discussion makes clear, plain-

---

tion that plaintiffs' experts were unqualified to testify, is not persuasive. *Daubert* simply held that the test for admission under Rule 702 is "a flexible one" that does not turn solely on the "general acceptance" within the scientific community of the principles on which the testimony is based. In fact, the Court rejected concerns—similar to those expressed by defendant in the case at bar—that its ruling would lead to the widespread admission of "pseudoscientific asser-

tions," and stressed the value of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" over outright exclusion of "shaky but admissible evidence." —— U.S. at ——, 113 S.Ct. at 2798. Nothing in *Daubert,* then, alters my conclusion that the expert testimony in question was admissible. If anything, that decision supports the decision to admit the expert testimony here.

tiffs introduced a wide array of both expert and lay testimony which tended to support their claims. Moreover, defendant's own proof, albeit substantial, was not overwhelming or free of weaknesses. Considering all the evidence and the complexity of the issues in the case, therefore, I cannot find that the verdict on liability amounts to a miscarriage of justice. Absent such a finding, the motion must be denied. *Bevevino,* 574 F.2d at 683.

In addition to the insufficiency-of-evidence argument, TCM has raised a number of other grounds in support of the Rule 59 motion. In general, they relate either to alleged misconduct on the part of plaintiffs' counsel, to the court's admission of, and plaintiffs' reliance upon, allegedly inadmissible evidence, and to the court's exclusion of evidence offered by defendant.

Many of these issues are simply rearguments of evidentiary issues or objections that were raised and decided at trial. I am not persuaded by defendant's claims of error concerning these matters.

Rule 59 must be read in conjunction with Rule 61, which states that even where error has been committed, the court should not grant a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

As indicated, all of the evidentiary issues raised by TCM in its post-trial motion were discussed at length during the trial. At that time, both sides were given ample opportunity to present their views and the Court made its rulings, often with an extensive statement of reasons for the ruling, often with reference to controlling case authorities.

I do not intend to repeat here my reasons for the many evidentiary rulings during trial. In most cases, the trial record sets forth my rulings and the basis for them. Therefore, I intend to comment here on some, but not all, of the arguments of TCM.

■ Defendant argues that the court erred in admitting correspondence between Robert Gross and TCM concerning Gross's complaints about problems with the aircraft engine. Defendant having "object[ed] on foundation," I admitted the letters subject to connection. Tr. 933. Later, defendant added a hearsay objection. Tr. 2117. After hearing argument on the issue, I admitted the letters "for the limited purpose of showing notice, knowledge on behalf of TCM, which are not ... hearsay issues, because they are not offered to show the truth of what's contained·in them." Tr. 2159.

TCM now contends that it was unduly prejudiced by the admission of these letters because the problems complained of in the letters did not relate to the specific defect alleged to have caused the crash, *i.e.,* the risk of an in-flight fire from a clogged fuel injector nozzle.

Defendant's argument rests on too restrictive a view of the relevance of the letters to the issue of notice. Although Gross may never have specifically complained about a clogged fuel injector nozzle, that does not make the letters irrelevant to TCM's knowledge of the *risk* of such a condition. Plaintiffs' theory, and the opinion of their expert, was that Gross's complaints put TCM on notice that the engine had certain fundamental problems that made it more likely that solid matter would be blown into, and clog, the fuel injector nozzles. *See* Tr. 947–48. As I stated on the record, the letters "relate[d] to TCM's failure to exercise due care after it received this information," Tr. 2354, which the jury could have found supported the failure-to-warn claim.

■ Furthermore, the letters were not admitted solely as evidence of notice, but also under Rule 703 as evidence relied upon by an expert in forming his opinion. It is well-established that otherwise inadmissible evidence may be received for the limited purpose of explaining the basis of an expert's opinion, and I stated my reasons for finding the letters admissible under this rule on the record. Tr. 2354–56.

■ Finally, I expressly and clearly instructed the jury on the limited purposes for which they could consider the letters. In the jury charge, I stated that

the letters may not be considered by you to establish that Mr. Gross did in fact have prior problems with his engine, as he claims to have had in the letters.... [Y]ou may consider the letters only as evidence that TCM at some point received those letters and had notice of Mr. Gross' complaints concerning the TCM engine. You may consider that for the limited purpose relative to the claim of failure to warn.... I also permitted these letters to be referred to by Mr. Sommer, who was an expert for plaintiff, but only to the extent that they related to or helped Mr. Sommer arrive at his opinion concerning the accident and the cause of it.

Tr. 4166–67. I recognize that defense counsel expressed the opinion that no instruction could cure the alleged prejudice from this evidence, Tr. 2362, but defendants had no objection to the wording of the instruction as such, and in my view it adequately cautioned the jury not to consider these letters as proof of the matters asserted therein.

▪ TCM contends that plaintiffs' use of demonstrative evidence in the form of video simulations was unfairly prejudicial. In particular, defendant attacks the use of a videotaped computer-generated animation which illustrated Sommer's theory of where the fire began inside the engine and how it spread.

Some of defendant's objections to this tape are simply a reworking of their objections to Sommer's testimony in general: that it was speculative, did not take actual conditions into account, was contrary to the evidence, and so on. I reject those arguments for the same reasons that I rejected them concerning the admission of Sommer's testimony.

Defendant's major objection to the video is that it was less an illustration of Sommer's testimony[2] than a purported re-creation of the accident, and as such was unduly prejudicial. Defendant made the same argument at trial, and I overruled the objection at that time, stating (outside the presence of the jury) that I would allow the tape to be shown, "to help the jury understand the expert's opinion as to what happened and that it's not

meant to be a re-creation. It's some visualization to allow the jury to conceptualize and appreciate the expert's opinion as to what happened here." Tr. 724. To reduce the possibility that the jury might interpret it as a re-creation of the accident, I also ordered that it be played with the volume turned off, so that the jury could not hear the taped voice-over of the radio communications between the actual aircraft and the airport control tower. Tr. 725.

▪ In addition, before the tape was shown to the jury, I gave a cautionary instruction, in which I stated that the animation was "not meant to be a re-creation of the accident," but "simply computer pictures to help you understand Mr. Sommer's opinion." To reinforce the point, I repeated that the video was "not meant to be an exact re-creation of what happened back there on November 26, 1986 ..." Tr. 840.

In my view, the video was admissible for the limited purpose given, and the cautionary instruction was more than adequate to guard against the jury giving it undue weight as a reenactment of the actual event. Defendant's arguments to the contrary are not persuasive.

▪ The mere fact that this was an animated video with moving images does not mean that the jury would have been likely to give it more weight than it would otherwise have deserved. As one commentator has observed, "If audio or visual presentation is calculated to assist the jury, the court should not discourage the use of it.... Jurors, exposed as they are to television, the movies, and picture magazines, are fairly sophisticated. With proper instruction, the danger of their overvaluing such proof is slight." 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[5] at 403–88 (1992 ed.) (footnotes omitted).

Defendant's contention that Sommer "repeatedly described the tape as a 'reconstruction,'" like other arguments made by defendant on this motion, rests on statements

---

**2.** Somewhat paradoxically, defendant argues that the tape was both inconsistent with and cumulative of Sommer's testimony.

taken out of context. Sommer stated that he had worked with an animator "to reconstruct a Beechcraft Debonair," and that "the purpose of [the video] is *to represent what I have reconstructed happened* to this aircraft in the final few moments of flight." Tr. 838–39. Thus, he did not state the animation literally reconstructed the accident itself.

Although defendant argues that there is no practical difference between recreating an accident and re-creating an expert's theory of the accident, the difference is both real and significant; it is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's *opinion* of what happened. So long as that distinction is made clear to them—as it was here—there is no reason for them to credit the illustration any more than they credit the underlying opinion.

 It is also because of that distinction that tests or experiments that merely illustrate a theory or scientific principle are not required to possess as high a degree of similarity to the actual event as are purported re-creations of the event. *See, e.g., Roland v. Langlois,* 945 F.2d 956, 963 (7th Cir.1991); *Champeau v. Fruehauf Corp.,* 814 F.2d 1271, 1278 (8th Cir.1987). As I stated on the record in the case at bar, the video here was intended merely to illustrate Sommer's opinion, and the various differences between what was shown on the tape and the actual conditions of the flight went only to weight to be given to the animation, not to its admissibility.

 There is also no basis for a new trial because of the alleged misconduct of plaintiff's attorney. Some instances of alleged misconduct concern allegedly inflammatory or improper statements to which defendants made objections, which were sustained.

For example, the court sustained defendant's objection to a question concerning other aircraft engines. Tr. 2390–91. It is true that there were further questions from plaintiffs' attorney along these lines, and I expressed my concern over these during the

trial. Tr. 2568. However, I also granted defendant's request to strike the testimony involved, and I directed the jury to disregard the objectionable questions and answers. Tr. 2598.

When a trial lasts for several weeks, it is hardly uncommon for a jury to hear some reference to inadmissible evidence. Likewise, "[t]he practice of instructing a jury to disregard improper testimony is necessary and well established." *United States v. Nixon,* 779 F.2d 126, 133 (2d Cir.1985). In my view, in the context of the trial as a whole, the striking of this testimony and the instruction to the jury not to consider it sufficiently cured any prejudice to defendants.

I also deny the motion as it relates to the other alleged improprieties by plaintiffs' counsel, including his comments during closing argument.

 A court should "examine the propriety of closing argument by reviewing the entire argument 'within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court.'" *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 619 (5th Cir.1988) (quoting *Westbrook v. General Tire & Rubber Co.,* 754 F.2d 1233, 1238 (5th Cir. 1985) (per curiam)). Considered against those factors, the remarks at issue here do not warrant a new trial.

Some of defendant's claims of attorney misconduct are simply incorrect and based on misinterpretations of plaintiffs' counsel's statements. For example, defendants contend that counsel told the jury in his closing that William Tatum, an eyewitness to the crash, "had testified to seeing the plane with a 'fire[ ] at the motor' before the accident ..." Def.Memo. p. 77. Had counsel said that, he would indeed have misstated the evidence, for Tatum said that prior to the crash he had only seen sparks as the plane hit some trees. Tr. 467.[3]

That is not what plaintiff's counsel said, however. He stated in closing that Tatum "said when he first saw the airplane on fire,

---

**3.** Tatum was mistakenly identified in a police report as "Mr. Price." References to Price and Tatum are actually to the same person. Tr. 468–69.

the fire was at the motor." Tr. 4068. That was perfectly true; Tatum said in a deposition that "When the airplane was sitting up like this [*i.e.*, on the ground], the fire was at the motor." Tr. 3724. Defendant's characterization of counsel's remarks, then, is clearly wrong.[4]

I am equally unpersuaded by defendant's claim that it was unfairly prejudiced by counsel's alleged injection of his personal opinions into his closing argument. Without reciting each statement complained of, I believe that, in the context of plaintiffs' entire argument and the trial as a whole, the statements were not likely to have affected the jury's evaluation of the evidence, particularly since the jury was instructed more than once that counsel's statements were not to be taken as evidence in the case. Tr. 253–54, 4120–21.

As stated, the trial lasted about a month. The issues were hotly contested, and it was undoubtedly obvious to the jury that feelings ran high on both sides. In any trial, but particularly under circumstances such as these, claims of attorney misconduct must be viewed in the context of the trial as a whole; were it otherwise, few judgments could stand judicial scrutiny. Considered in that light, the statements in question by plaintiffs' counsel were not serious enough to have amounted to actual misconduct or to have prejudiced defendant. *See Baker v. Connecticut Bank & Trust Co.*, 125 F.R.D. 25 (D.Conn.1988) (defendant's allegedly improper closing argument did not warrant new trial, since jury, after observing two sides' attorneys wage battle for sixteen days, could not have been affected by counsel's caustic remarks).

Moreover, I instructed the jury both in the preliminary instructions at the start of the case, and again in the jury charge, that counsel's remarks are not evidence, and that the jury was not to be swayed by bias, prejudice, or sympathy, but to decide the issues solely on the basis of the evidence before them and the law as given to them by the court. Tr. 253–54, 4120–21. Jurors are presumed to obey the court's instructions in this regard as in any other. *See Nissho–Iwai*, 848 F.2d at 620 (lawyer's improper statements in closing did not require new trial, in part because trial court instructed jury that nothing said by lawyers was evidence and that jury should not be swayed by emotions or prejudice).

It must also be noted that some of these statements, particularly those made during plaintiffs' summation, were never objected to by defendant. "A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 11 C. Wright & A. Miller, § 2805 p. 39 (1973 ed.).

That principle holds true for alleged improprieties in closing arguments as well. *See M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir.1991); *Computer Sys. Eng'g, Inc. v. Qantiel Corp.*, 740 F.2d 59, 69 (1st Cir.1984). In fact, the Fifth Circuit has held that it is reversible error to *grant* a plaintiff's motion for a new trial based on admittedly improper statements during the defendant's summation when the plaintiff failed to object either during the argument or at a sidebar conference immediately thereafter. *Nissho–Iwai*, 848 F.2d at 619–20.

Defendant's suggestion that their silence at trial is excused by the court's having "discouraged" defense counsel from objecting is groundless. The court simply cautioned both sides against making "objections that are simply made to derail and discomfit your opponent and get them off track." Tr. 3974. I was clearly referring, then, only to objections with no real merit or value other than to distract one's opponent. Given defense counsel's proven tenacity and lack of shyness about objecting (there were 129 defense objections during the trial, by defendant's own count), it is less than credible for defendants

---

**4.** I am not suggesting that defendant has intentionally mischaracterized counsel's statements. After the trial was over, defendant retained additional counsel, who were not present at the trial.

Given the size of the transcript—4321 pages—it would not be surprising if defense counsel failed to make the correct connection between these widely scattered references to Tatum.

now to claim that they were cowed into passivity by my remarks.

## II. Issues Relating to Damages

### 1. Motion to Strike Affidavits

Defendant has moved in the alternative either for a new trial on damages or for remittitur. In support of these motions, TCM has submitted an affidavit of one of the jurors in the case, as well as the affidavits from two private investigators who interviewed that juror and some of the other jurors. The thrust of these affidavits is that members of the jury had heard of a $100 million verdict which was awarded on February 4, 1993, during this trial, in a products liability case involving a truck against General Motors ("GM") in Atlanta, Georgia, and that this influenced the jury's findings on damages in this case.

Plaintiffs have moved to strike these affidavits under Fed.R.Evid. 606(b), which provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As a threshold matter, there is a question of the propriety of defendant's having interviewed the jurors and obtained an affidavit from one of them without court approval or under court supervision. Contending that the court gave TCM permission to do so, defendant points to the following exchange between the court and plaintiff's attorney which took place shortly after the verdict was announced in court:

> Mr. Wolk: Your honor, are we allowed under your rules if the jury chooses to speak to us, to speak to them?
>
> The Court: You may.

Tr. 4320.

Thus, the court simply told counsel that *they* could "speak" to the jurors "if the jury cho[se] to speak" to counsel. It was contemplated that this would occur, if at all, in the courthouse. The court did not give the parties *carte blanche* authority to launch a full-scale interrogation of the jury by private investigators with an eye toward trying to impeach the verdict.

Under the circumstances, I find that TCM, and its counsel, engaged in improper procedure in interrogating the jurors in this fashion without court approval. In fact, the procedure followed by TCM has been expressly condemned as "reprehensible" by the Second Circuit, which has stated that

> complicity by counsel in a planned, systematic, broad-scale, posttrial inquisition of the jurors by a private investigator or investigators is reprehensible, to say the least.... [W]here a full dress inquiry of this sort was intended to be launched, "... post-trial questioning of jurors must only be conducted under the strict supervision of the court, with inquiry restricted to those matters found by the court as both relevant and proper."

*United States v. Moten*, 582 F.2d 654 (2d Cir.1978) (quoting *United States v. Brasco*, 516 F.2d 816, 819 n. 4 (2nd Cir.), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975)). This unequivocal statement applies precisely to the facts here.

In any event, I find that the affidavits are not admissible under Rule 606, to the extent that they relate to the jury's thought processes in reaching a verdict. Rule 606 specifically excludes reference to anything that occurred during the course of deliberations relating to the jurors' thought processes. It is only "extraneous prejudicial information" which was brought to the jury's attention that is at all relevant. This distinction is significant here, for "while the courts have accepted the testimony of jurors to establish that impermissible outside influ-

ences were brought to bear on a jury, they have consistently refused to consider statements by jurors relating either to the subjective effect such influences might have had on them or to the mental processes through which they arrived at their verdict." *United States v. Green,* 523 F.2d 229, 235 (2d Cir. 1975) (citation omitted), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). *See also United States v. Maree,* 934 F.2d 196 (9th Cir.1991) (juror's statement that she had discussed evidence in case with two friends during trial, and that they had encouraged her to find defendant guilty, was admissible to show outside influence on juror; however, juror's statement that her friends had convinced her to vote guilty was inadmissible evidence of juror's thought processes).

This distinction balances the rights of the parties with the interest in maintaining the finality of jury verdicts. The Second Circuit "on a number of occasions has stressed that the strong public interest in the integrity of jury verdicts and the protection of jurors from harassment requires that investigation into the subjective motivations and mental processes of jurors not be permitted." *Green,* 523 F.2d at 235. Allowing impeachment of a verdict by such testimony would "make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 110 (2d Cir.1985) (quoting *McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)).

Thus, if I were to consider the juror's affidavit at all, it would only be with regard to the jury's having heard of the GM verdict. I would not consider any evidence that this jury had used the GM verdict as part of the basis for the award in this case.

 Viewed objectively, the news of the GM verdict during the trial of this case was not so prejudicial to defendants as to require further inquiry of the jurors or modification of the verdict. The GM case did not involve an airplane but a truck that caught fire on impact. Furthermore, large damages

awards are frequently reported in the news media, and it is to be expected that jurors will be aware of such awards. Few verdicts could stand if mere knowledge of an award in another unrelated case were grounds for setting aside a verdict.

The fact that the GM verdict was announced during this trial may have made it somewhat more prominent in the jurors' minds than would otherwise be the case, but not to a degree that would warrant vacating the award. This was not a situation in which the jurors saw news accounts concerning their own case. At most, they simply heard about an unrelated case some three weeks before they reached a verdict. The GM verdict may thus have become one more component of the jurors' body of common knowledge and experience which they brought to the deliberations, but in my view it was not prejudicial information "improperly brought to bear" upon the jury.

I also note that at no time during the trial itself did any counsel even mention the GM verdict to the court, much less ask me to inquire whether the jury had heard about it or to give an additional cautionary instruction of some kind. Defendants do not deny that they were aware of the GM verdict when it was reported, and any request for a curative or prophylactic measure should have been made then, not after the trial was over. Since no such request was made, the GM verdict must not have seemed terribly significant to the attorneys at the time, and their attempt to magnify its importance in hindsight is not persuasive.

### 2. Standard of Review

By all accounts, this jury's verdict of $107,-000,000 for pain and suffering is extraordinarily high. This is a diversity action, and I must apply New York law on the matter.[5] Therefore, the Court must determine what the proper standard of review should be in this case.

A 1986 amendment of N.Y.C.P.L.R. § 5501(c) replaced the "shocks the conscience" standard for review of damage

---

**5.** I deny plaintiffs' motion to apply North Carolina law on the issue of remittitur, for the rea-

sons stated in my prior decision entered on April 1, 1992.

awards by the New York State Appellate Division courts:

### § 5501. Scope of Review

\* \* \* \* \* \*

(c) Appellate division.... In reviewing a money judgment in an action in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

It is not clear if this applies to federal diversity actions. The Second Circuit has noted the possibility that it might, but has not yet decided the issue; *see Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 n. 7 (2d Cir.1993); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1190 (2d Cir.) (stating in *dictum* that § 5501(c) "seems to apply *only* to the appellate division," but finding it unnecessary to decide the issue under the facts of the case), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

There is some district court authority within this circuit that the two standards do not conflict in a federal diversity action. In *In re Joint Eastern & Southern Dist. Asbestos Litigation*, 798 F.Supp. 925 (E. & S.D.N.Y. 1992), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.1993), the court stated that although

> the New York Court of Appeals appears to take the recitation of the incorrect standard as error, which implies that some difference exists, ... [f]or the purpose of a federal court's remittitur decision, however, the two standards work in harmony. It "shocks the conscience" of a federal judge for a federal court sitting in diversity to allow a verdict which would necessarily be

remitted as a matter of law by a state court using the appropriate state standard.

*Id.* at 937 (citations omitted).

In the case at bar, I find that the distinction has no practical effect. Under either standard, the award is excessive and has to be reduced, and the amount by which it is reduced would be the same under either standard.

### 3. Remittitur or New Trial

■ In general, remittitur is employed when a damage award "is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984).

■ "In determining whether an award is so excessive as to shock the judicial conscience, [I] look, as a court sitting in diversity, to other jury awards condoned by the courts" of New York State. *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740, 750 (2d Cir.1984). The ultimate task of this court is "to ensure 'that the damage award does not exceed that which could be sustained were the case before the highest court of the state whose substantive law gives rise to the claim,'" bearing in mind that "New York appellate courts regard prior awards as not binding but instructive." *Id.* (quoting *Hysell v. Iowa Pub. Serv. Co.*, 559 F.2d 468, 472 (8th Cir.1977)). Thus, New York cases do not "set[ ] a maximum on the plaintiff's permissible recovery, but [they] provid[e] guidance as to levels of recovery that are realistic rather than fanciful.'" *Id.* at 754; *see also Joint Asbestos Litigation*, 798 F.Supp. 925.[6]

■ When a jury award is deemed to be excessive, the Court may order a new trial

---

**6.** I do not accept plaintiffs' suggestion that the recent decision of the Supreme Court in *TXO Production Corp. v. Alliance Resources Corp.*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), holds that comparison of a particular damage award to awards in other cases is "meaningless." *TXO* is not applicable to the instant case, since the Court limited its holding to whether a *punitive* award is presumptively

*unconstitutional* because it departs from awards in other cases. Furthermore, the Court stated that other awards could be a relevant consideration, and simply declined "to enshrine" such analysis as a test for constitutionality. That is perfectly consistent with the rule that reported New York cases are to be treated as instructive, but not binding.

under Rule 59 or, in its discretion, the Court may condition denial of the motion for a new trial on plaintiffs accepting a remittitur of the excessive portion of the award.

 Although there are no firm rules governing which of these two courses should be taken, in general remittitur is employed when "the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984) (quoting *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898 (2d Cir. 1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983)). Thus, remittitur is appropriate when "a properly instructed jury hearing properly admitted evidence makes an excessive award"; however, when "prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss," the court must grant a new trial. *Id.*

I believe that remittitur is the appropriate remedy in this case. For one thing, although the award is clearly excessive under New York case law, the excess is not ascribable to any particular error or other unduly prejudicial influence.

 I do not believe that the sheer size of the award itself mandates a new trial on damages as opposed to remittitur. The size of the verdict by itself should not be controlling. That is particularly true given the lack of a truly objective standard by which to measure awards for pain and suffering, other than awards from other cases. As another court from this Circuit observed in *Sundbom v. Erik Riebling Co.,* 89 Civ. 4660, 1991 WL 12116, 1991 U.S.Dist. LEXIS 812 (S.D.N.Y. January 24, 1991), juries are typically given little if any precise guidance on how to fix damages for pain and suffering, other than being told that they arrive at a "reasonable" sum. The jury in this case paid close attention to the evidence and to the court's instructions, and "[t]hat they returned an award that the Court now finds 'excessive,' as compared to other awards sustained on appeal, is attributable solely to the lack of meaningful guidance given them during the course of the deliberations, not to any impropriety on their part." *Id.,* 1991 WL 12116 at *2, 1991 U.S.Dist. LEXIS 812 at *4.

Defendant now also suggests that the jury was unduly influenced by my statements concerning the verdict form. During my instructions to the jury, I explained that, if they found comparative fault on Robert Gross's part, they should not attempt to adjust the damages found to reflect that allocation of fault. As an example, I stated that

if you find that Robert Gross suffered a certain amount of pain and suffering, whether it is ten dollars or ten million dollars, whatever the figure is, just put it down there. Don't worry about the fact maybe you found Robert Gross was fifty percent at fault back there in Question 6. That is of no concern to you.

Tr. 4184.

The point made to the jury was that they should not attempt to discount the damage award according to the percentage of fault attributed to each party. The Court was responsible for that calculation, not the jury.

 Defendant argues that the reference to ten million dollars "may have unintentionally led the jury to believe that the range of reasonableness on the facts of this case extended to an eight-figure sum per person." That contention borders on the ludicrous.

First, I note that defendants made no objection or request to clarify this statement at trial. That alone is reason enough to deny defendant's motion on this ground.

In addition, defendant has taken the statement completely out of context. The instructions at that point were not about the amount of damages, but the allocation of fault. The use of specific dollar figures was purely an example, a fact which was made more obvious by the use of a very high *and* a very low figure. Defendants have offered no plausible reason why the jury was not equally likely to have subconsciously thought by my reference to ten dollars that a two-figure amount per person was appropriate. The clear import of my remarks was that regardless of the amount that the jury found reasonable, they were simply to enter that amount, and leave it at that.

■ I do not believe, then, that the award here was so infected or tainted by prejudice that it must be set aside entirely and a new trial granted. Rather, the size of the award is most likely indicative of the jury's belief that decedents had suffered intensely, and that the damages should be correspondingly high. The jury's will in that regard may still be honored by reducing the award to the largest amount sustainable on these facts under New York law.

Another factor weighing against a new trial on damages is the impracticability of such a measure in this case. The primary damage claim here is the pain and suffering of the four decedents. This is not a case in which the facts relating to plaintiffs' injuries can be established with precision by third-party testimony or other corroborating evidence. Other than liability, the principal issue in this case was how to value the pain and suffering endured by each plaintiff prior to death. The cause of death and the length of time each plaintiff suffered was hotly contested. It was established through circumstantial evidence and expert testimony. The extent to which decedents suffered depends in large part on when and how the fire began in the aircraft, when it entered the passenger compartment, and how long, if at all, decedents consciously suffered prior to their deaths. All of those issues are disputed, and in many ways they are intertwined with the issues concerning liability, particularly with respect to the time and place of origin of the fire. To attempt to retry the case solely on damages, then, would likely be futile. *See Wagenmann v. Adams*, 829 F.2d 196, 217 (1st Cir.1987) (in denying motions for new trials, district court properly considered, and rejected, possibility of new trial on damages alone, citing impossibility of separating damages issues from liability issues without creating such confusion and uncertainty as would amount to abandonment of fair trial).

### 4. The Award in this Case

■ I find that the award for decedents' conscious pain and suffering is beyond the bounds of reasonableness for the damages involved. Even though the state cases are not literally binding, the award in this case so far exceeds any award for comparable pain and suffering that has been sustained in the reported cases from New York that it must be reduced.

Of central importance is the fact that the decedents' conscious pain, regardless of how terrible it may have been, was undisputably of relatively short duration. The expert evidence was in conflict concerning how long decedents were conscious during the crash and fire, but even plaintiffs' own medical expert opined that decedents did not live more than several minutes after the fatal fire entered the passenger compartment.[7]

The relatively brief period of consciousness before death is a factor that New York Courts have considered in reducing large awards for pain and suffering. In *Greene v. City of New York*, 170 A.D.2d 321, 566 N.Y.S.2d 40 (1st Dep't), *app. denied*, 78 N.Y.2d 853, 573 N.Y.S.2d 466, 577 N.E.2d 1058 (1991), for example, the court reduced an award from $1,000,000 to $300,000 because there was considerable doubt as to whether and to what extent the decedent had experienced conscious pain and suffering during the nineteen days between his injury and death, during which time he remained in varying degrees of coma. The court stated that "[e]ven relatively brief periods of consciousness would not warrant the kind of award plaintiff received here, especially where the injured party lapsed into coma almost immediately after injury." (Citations omitted).

Similarly, in *Grcic v. City of New York*, 139 A.D.2d 621, 527 N.Y.S.2d 263 (2d Dep't), *motion denied*, 73 N.Y.2d 702, 536 N.Y.S.2d 743, 533 N.E.2d 673 (1988), the court held that although the evidence supported the

---

**7.** Dr. Butts, plaintiffs' expert, testified that Robert Gross would have endured conscious pain and suffering "for some period of seconds, perhaps even minutes ..." Tr. 1830. Susan Gross, in his opinion, survived during the crash and fire for a period that lasted "more than a second or two, and could have been up to several minutes." Tr. 1837. Dr. Butts opined that Michael Gross "survived longer" than his parents, but he stated no specific time period. He did not state an opinion on how long David Gross survived.

conclusion that the decedent had experienced conscious pain and suffering prior to death, given that the interval of consciousness was short and the degree of consciousness slight, the jury's award of $670,000 for conscious pain and suffering was excessive to the extent that it exceeded $150,000.

■ Particularly when the duration of conscious pain is short, other factors must also be taken into account in determining damages, including "the degree of consciousness, severity of pain, [and] apprehension of impending death ..." *Juiditta v. Bethlehem Steel Corp.*, 75 A.D.2d 126, 428 N.Y.S.2d 535 (4th Dep't 1980); *Tenczar v. Milligan*, 47 A.D.2d 773, 365 N.Y.S.2d 272 (3d Dep't 1975).

Undoubtedly the pain suffered by decedents in this case was excruciating and intense. Their awareness of impending death—both for themselves and for each other—must also be considered. Nevertheless, the reported cases show that the most excruciating pain, even for periods longer than that involved here, cannot justify damages of the magnitude awarded by the jury in the case at bar. *See, e.g., Van Norden v. Kliternick*, 178 A.D.2d 167, 577 N.Y.S.2d 27 (1st Dep't 1991) ($300,000; decedent was conscious and in severe pain for five hours); *Sullivan v. Locastro*, 178 A.D.2d 523, 577 N.Y.S.2d 631 (2d Dep't 1991) ($2,500,000 reduced to $1,500,000; decedent "was in virtually constant physical and emotional pain for the more than three years of conscious life" after he was struck by car), *app. denied*, 81 N.Y.2d 701, 594 N.Y.S.2d 715, 610 N.E.2d 388 (1992); *Torelli v. City of New York*, 176 A.D.2d 119, 574 N.Y.S.2d 5 (1st Dep't 1991) (modifying trial court's reduction of award from $1,074,000 to $75,000, and ordering reduction instead to $250,000; decedent killed in head-on collision suffered pre-impact fear and terror, "horrendous" injuries, and was conscious for 15 minutes to an hour), *app. denied*, 79 N.Y.2d 754, 581 N.Y.S.2d 282, 589 N.E.2d 1264 (1992); *Gonzalez v. New York City Housing Auth.*, 161 A.D.2d 358, 555 N.Y.S.2d 107 (1st Dep't 1990) ($1,000,000 award reduced to $350,000; murder victim was asphyxiated by gagging, and also suffered numerous fractures and bruises); *Coffey v. Callichio*, 136 A.D.2d 673, 523 N.Y.S.2d

1011 (2d Dep't 1988) ($35,000; decedent, whose injuries from automobile collision included crushed skull, was conscious and suffered extensively for 15 to 20 minutes before lapsing into coma); *Regan v. Long Island R.R. Co.*, 128 A.D.2d 511, 512 N.Y.S.2d 443 (2d Dep't 1987) ($275,000; 15–year–old decedent suffered burns over 75% of his body from electrocution; decedent had become "a ball of fire" and rolled on the ground screaming for several minutes until bystander was able to extinguish flames; decedent was conscious for most of the five days between electrocution and death, and suffered both from his injuries and from burn treatments); *Walsh v. Morris*, 126 A.D.2d 911, 511 N.Y.S.2d 428 (3d Dep't 1987) ($50,000 award increased to $150,000; decedent endured "indescribable suffering and sheer agony" for 1154 days between accident and death); *Pollock v. Collipp*, 124 A.D.2d 647, 508 N.Y.S.2d 34 (2d Dep't 1986) ($200,000 for death by hypothermia after 55 minutes in cold water); *Rush v. Sears, Roebuck & Co.*, 92 A.D.2d 1072, 461 N.Y.S.2d 559 (3d Dep't 1983) (reducing $4,000,000 award in personal injury case to $1,500,000 for teenage girl who had suffered severe burns over 42% of her body, resulting in "long and painful periods of hospitalization and treatment, skin grafting, debridement, permanently disfiguring scars and excruciating pain and suffering"); *DeLong v. County of Erie*, 89 A.D.2d 376, 455 N.Y.S.2d 887 (4th Dep't 1982), *aff'd*, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983) ($200,000; stabbing-murder victim could have suffered about twelve minutes of conscious pain, as well as terror of struggling to save herself and her infant); *Juiditta*, 75 A.D.2d 126 ($70,000; decedent, who was struck by railroad car, was left lying on track about forty minutes, during which time she was alive, screaming, and bleeding profusely, and was able to answer when asked her name by a would-be rescuer).

Diversity cases within this circuit applying New York law also do not support the award in this case. *See, e.g., Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir.1984) ($10,000 for pre-impact pain and suffering in plane crash, based on evidence that decedent could have seen left engine and part of wing break away some thirty seconds

before crash); *In re Inflight Explosion on Trans World Airlines,* 778 F.Supp. 625 (E.D.N.Y.1991) ($85,000 for conscious pain and suffering of decedent as he was being blown out of plane by explosion, and as he was falling to ground; decedent might have been alive five to ten seconds after in-flight blast), *rev'd on other grounds,* 975 F.2d 35 (2d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993); *Potdevin v. Dorset Hotel Co.,* No. 87 Civ. 3603, 1991 WL 12312 (S.D.N.Y. Jan. 30, 1991), 1991 U.S.Dist. LEXIS 959 ($285,000; murder victim, who was killed by axe or similar instrument, suffered fourteen blows, although pathologist testified that one of first two blows would have been fatal); *Barrett v. United States,* 660 F.Supp. 1291, 1322 (S.D.N.Y. 1987) ($500,000; decedent, who dies as result of injection of mescaline derivative as part of U.S. Army chemical warfare experiment, was conscious for ninety minutes before lapsing into coma, during which time decedent's symptoms included wild flailing of arms, profuse sweating, clenched teeth, frothing at mouth, and generalized tremor and rigidity; decedent also underwent "tremendous mental distress" because chemical was hallucinogen and was administered "in a sterile, unfriendly atmosphere against his will"); *Stissi v. Interstate and Ocean Transport Co.,* 590 F.Supp. 1043 (E.D.N.Y.1984) ($30,000; death by cardiopulmonary arrest due to drowning resulting from two-boat collision), *aff'd in part and rev'd on other grounds in part,* 765 F.2d 370 (2d Cir.1985); *Beckcom v. United States,* 584 F.Supp. 1471 (N.D.N.Y.1984) ($800,000; decedent, whose breast cancer was not properly diagnosed or treated, underwent tremendous pain and mental suffering, both from cancer itself and from chemotherapy and surgery, between time of first symptoms in 1971 and her death in 1983, by which time cancer had spread to many parts of her body).

The jury's award here, then, clearly must be reduced. To what extent must it be reduced? In considering this, I am mindful of the Second Circuit's holding that when ordering remittitur, the court should reduce the award by an amount which *least* intrudes upon the province of the jury. *Earl v. Bouchard Transportation Co.,* 917 F.2d 1320,

1330 (2d Cir.1990). Under this approach, "the remitted amount should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive." *Id.* at 1328.

In this case, the jury could reasonably have found that decedents suffered unbearable pain, as well as extreme mental anguish both from fear of their own deaths and out of concern for each other. It is clear, however, that the proof showed that their suffering lasted at most for several minutes. There was no significant difference in the time that each lived. Under these facts, and using the "least intrusive" standard, I find that the damages for conscious pain and suffering should not have exceeded $250,000 for each decedent.

Therefore, I grant defendant's motion for a new trial on damages unless plaintiffs stipulate to a remittitur as to each decedent of the amount awarded by the jury that exceeds $250,000.

5. Wrongful Death Award to Juletta Cook

Juletta Cook, the mother of Susan Gross, was awarded $250,000 on her wrongful death claim. TCM moves for a remittitur of this amount.

Recovery for wrongful death in New York is measured by the amount of "pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." N.Y.E.P.T.L. 5–4.3. The court in *Franchell v. Sims,* 73 A.D.2d 1, 424 N.Y.S.2d 959 (4th Dep't 1980), discussed the elements of pecuniary loss resulting from the death of one's child:

Where parents are the plaintiff beneficiaries the pecuniary injuries include loss of their child's services, not limited to the decedent's minority. Fair compensation may properly include probable, or even possible, benefits which might inure to the parents from their child's entire life, taking into consideration the possibility of failure or misfortune. Among the myriad factors to be considered are the decedents' physical status—which includes factors such as age, sex, life expectancy, state of health,

habits; and the decedents' earnings potential—i.e., character, quality, intelligence, present and future earnings and probability of means to support parents, if they are in need. Also to be viewed is the relationship between decedent and those claiming to suffer pecuniary loss and those persons' health, age and circumstances.

Another factor to consider is "whether the decedent would have been legally obligated to support the beneficiary and, if not, whether there is any evidence that the decedent would have volunteered to do so." *Public Administrator, Kings County, v. U.S. Fleet Leasing of New York, Inc.,* 159 A.D.2d 331, 552 N.Y.S.2d 608 (1st Dep't 1990).

Juletta Cook, a retired schoolteacher, was 77 years old and a widow when decedents were killed. She testified at trial that she saw decedents "every month or so" in the year prior to their deaths. Tr. 1897. Sometimes decedents visited her at her home in Staten Island, and sometimes Cook visited them in Rochester. She stated that Susan Gross helped her shop for clothes and, when Susan visited her, "she would fill up my house with groceries ..." *Id.* Susan also helped her with her tax returns, and dealt with contractors when Cook's property needed repair or maintenance. Tr. 1898. Susan accompanied Cook on visits to Cook's doctor, whom she visited for treatment of her arthritis in particular. Tr. 1899. Cook stated that at the time of Susan's death, they had been planning for Cook at some point to relocate to the Rochester area to live with decedents. Tr. 1901.

Marjorie Datskow (Robert Gross's sister) also testified about Susan's relationship with Cook. She largely corroborated Cook's testimony that Susan helped Cook with financial and household matters, and that Susan "made sure that things got done when they needed to get done." Tr. 1921. She testified that Susan had expressed concern over her mother's health and the fact that Cook lived alone. She stated that at the time of trial, Cook's "arthritis ha[d] gotten much worse,"

and that Cook needed help getting around. Tr. 1922.

In the instant case, the evidence showed that Susan Gross had an established career as a research chemist at Eastman Kodak, that she provided some services to Cook and was likely to continue to do so, and that she maintained a close relationship with her mother. At the same time, however, there is little evidence that Susan Gross provided much in the way of actual financial support to Cook, or that Cook needed such support. There was also no evidence of the amount of Susan Gross's income. In addition, it cannot be ignored that Cook was at a relatively advanced age at the time of the fatal accident.

■ Presumably, the jury took this last factor into account when they found that the award was for ten years' worth of support.[8] In effect, however, that means that the jury awarded Cook $25,000 per year for the remainder of her life expectancy at the time of the crash. In my view, the evidence does not support such a high figure. Although Susan Gross did provide some personal services to her mother, the frequency of those services was limited by their living hundreds of miles from each other. Even if they did visit each other regularly, most of the time they were separated.

Also, while there was evidence that there had been some talk of Cook moving in with the Grosses, it does not appear that there were any concrete plans in that regard. *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202 (2d Cir.1984), is relevant in this regard. In *Shatkin,* the Second Circuit held that the trial judge did not err in excluding evidence of the plaintiff mother's needs and her deceased son's income for failure to lay a proper foundation by showing a probability that he would have supported her and the extent of such likely support. Although the son was devoted to his mother, gave her some money and gifts, did repairs on her house and had advised her that she could come live with him, the court held that without evidence that the son had made a firm

---

**8.** In accordance with N.Y.C.P.L.R. § 4111, the jury stated in its verdict that the award to Juletta Cook was intended to provide compensation to Cook for 10 years. The jury had been instructed that Cook had a life expectancy of 10.5 years at the time of Susan Gross's death.

commitment with any reasonable degree of certainty to support his mother, the district court did not abuse its discretion in excluding evidence about the mother's financial condition and the son's possible future income.

The reasoning behind the holding in *Shatkin* was that the point sought to be proved by the proffered evidence—that the mother lost the future support by her son—was too speculative in the absence of evidence of a firm commitment of support. 727 F.2d at 208. Similarly, in the case at bar, it would be speculative to conclude whether or when Cook would actually have moved to the Rochester area had Susan survived.

In plaintiffs' favor is that Susan Gross had an established career and had some financial means to contribute to her mother's support. As stated, however, the award made by the jury amounts to an average of $25,000 per year for Juletta Cook's life expectancy. At the time of her death, Susan Gross was not providing anywhere near that amount of support to her mother. The award would only be supportable, therefore, if it were reasonably inferable that Susan Gross's services to her mother were likely to increase very substantially after 1986. Even allowing for some likely increase in the amount of support Susan Gross would have provided Cook, and without in any way minimizing the services that she did provide, in my view the evidence did not support such an inference.

The lack of evidence of Susan Gross's income also undercuts the support for the award. "Generally, evidence of a decedent's gross income at the time of death is the standard to measure the value of income already lost and to measure the loss of future earnings." *Johnson v. Manhattan & Bronx Surface Transit Operating Auth.,* 71 N.Y.2d 198, 204, 524 N.Y.S.2d 415, 519 N.E.2d 326 (1988); *see also Gonzalez,* 77 N.Y.2d 663, 668, 569 N.Y.S.2d 915, 572 N.E.2d 598. That is not to say that evidence of a decedent's income is a *sine qua non* of an award. *See Ray v. Oddo,* 175 A.D.2d 155, 572 N.Y.S.2d 44 (2d Dep't 1991). Some award was supportable based on the evidence of Susan Gross's age and health at the time of her death, her position at Kodak and her standard of living, and the support which she had

already provided to her mother. Nevertheless, I believe it would be highly speculative to conclude on this evidence that she would have been able, willing, and likely to provide Cook with support in the amount awarded by the jury.

Though there are some New York cases sustaining awards of similar magnitude, they tend to contain some significant distinguishing factors, such as more immediate, day-to-day support, including regular monetary contributions; proof of actual or prospective earnings of the deceased; or younger parents and children, with a concomitant likelihood of a longer period of support and services had the child lived. For example, in *James v. Eber Bros. Wine & Liquor Corp.,* 153 A.D.2d 329, 550 N.Y.S.2d 972 (4th Dep't 1990), the court affirmed a $250,000 award to the parents of a 29–year–old airplane mechanic who, at the time of his death, lived with his parents, had no steady girlfriend, earned $27,000 per year and paid his parents $150 monthly rent. The decedent also contributed an average of seven to eight hours per week working on and around the house. The plaintiff's expert economist valued the projected monetary loss of his household services at $92,641, and the loss of rental payments at $55,526, based on the assumptions that the decedent would have remained single and continued to live in his parents' house until the end of his mother's life expectancy of 29 more years.

In *Williams v. City of New York,* 169 A.D.2d 713, 564 N.Y.S.2d 464 (2d Dep't 1991), the court reduced a $600,000 award to the decedent's mother to $325,000. The 20–year–old decedent was a high school graduate employed at a McDonald's restaurant. However, he lived with his mother, and contributed about $50 cash and $10 worth of groceries per week to the household. He daily helped his mother, who suffered from arthritis, with household tasks and the care of four nieces and nephews who shared their home. He also had planned to attend college in the near future, which could have increased his earnings potential.

In *Rowan v. County of Nassau,* 91 A.D.2d 608, 456 N.Y.S.2d 418 (2d Dep't 1982), the court reduced a $500,000 award to $150,000,

where the evidence showed that when the plaintiffs' son died at age 23, he was single, employed, lived with his parents, contributed $50 per week to the household, and had been contributing various sums since an early age. Noting that in the normal course of events the decedent would have moved away from his family, the court stated that while he may still have assisted them financially, the amount of such assistance could not reasonably have been expected to reach the amount awarded. *See also Greene v. City of New York*, 170 A.D.2d 321, 566 N.Y.S.2d 40 (1st Dep't 1991) ($110,000. award for death of plaintiffs' child, a high school student, reduced to $100,000); *Halvorsen v. Ford Motor Co.*, 132 A.D.2d 57, 522 N.Y.S.2d 272 (3d Dep't 1987) ($600,000 verdict reduced to $150,000, since proof showed that decedent's projected loss of earnings was $482,000; "even the most generous son could not reasonably be expected to give his mother more than he. earned in his lifetime"); *Horne v. Metropolitan Transit Authority*, 82 A.D.2d 909, 440 N.Y.S.2d 695 (2d Dep't 1981) ($70,-000 award, which trial court had reduced from jury verdict of $125,000, further reduced to $50,000, based on potential earnings of the decedent (whose age was not given) and length of time he would likely have contributed to his parents' support had he lived and, as was probable, gotten married); *Franchell*, 73 A.D.2d 1, 424 N.Y.S.2d 959 (awards of $3300 and $5840 respectively for wrongful deaths of 22–year–old son and 16–year–old son increased to $25,000 and $30,-000).

■ Again, these cases are not entirely comparable to the instant case, in which the persons involved were older and in different financial circumstances. What they show, however, is that the amount of a wrongful death award cannot exceed that which is supported by the evidence. *Cf. Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1058–59 (2d Cir.1990) ($250,000 award for loss of 6–year–old son reduced to $100,000); *Moyer v. State of New York*, 175 A.D.2d 607, 572 N.Y.S.2d 262 (4th Dep't 1991) (mother failed to prove any pecuniary loss from death of 18–year–old son); *Brookman v. Public Service Tire Corp.*, 86 A.D.2d 591, 446 N.Y.S.2d 132 (2d Dep't 1982) ($88,000 verdict reduced to $44,000 where decedent was student who did not contribute money to household, and there was no evidence that future contributions would be made).

I find on the basis of the evidence at trial that the wrongful death award on behalf of Juletta Cook was not supportable to the extent that it exceeded $100,000. I therefore order a new trial on damages unless plaintiffs stipulate to a remittitur of $150,000.

6. Property Damage Award to Grossair, Inc.

■ Defendants move for a new trial on damages on the $30,000 award to Grossair Inc., or in the alternative for a full remittitur, *i.e.,* to zero dollars. Defendants contend that there was no proof of the market value of the aircraft.

The only evidence relating to the value of the airplane came from Marjorie Datskow, who testified that the plane was purchased in 1982 for $22,400. Tr. 1919. There was no evidence, however, of the fair market value of the plane at the time of the crash in 1986.

■ When property has been completely destroyed, "the measure of damages is its reasonable market value immediately before destruction less its salvage value." *Owens v. State of New York*, 96 A.D.2d 630, 631, 464 N.Y.S.2d 870 (3d Dep't 1983) (where only proof of automobile's value was claimant's testimony that he paid about $700 for the car and made repairs costing about $1,000, failure to prove fair market value before and after loss rendered proof insufficient to sustain any award for the loss). Because of the complete failure of proof as to this item of damage, I will grant the motion for judgment as a matter of law and vacate the award to Grossair, Inc.

Under Rule 50(c), when the district court grants a motion for judgment as a matter of law, the court must also rule on whether the motion for a new trial should be granted if the judgment is thereafter vacated and reversed. I will conditionally grant the motion for a new trial in this case. The jury's award of $30,000 to Grossair was plainly not supported by the evidence.

## CONCLUSION

Defendant's motion for judgment as a matter of law under Fed.R.Civ.P. 50 is granted as to the award of $30,000 to Grossair, Inc. In all other respects, the motion is denied.

Defendant's motion for a new trial on damages pursuant to Fed.R.Civ.P. 59 is granted, unless plaintiffs stipulate and agree to a remittitur of all sums exceeding $250,000 for each of the four plaintiffs for a total award of $1,000,000 for pain and suffering.

Defendant's motion for a new trial on damages pursuant to Fed.R.Civ.P. 59 is granted concerning the award to Juletta Cook, unless plaintiffs stipulate and agree to a remittitur of sums above $100,000.

The jury verdict for $5,000 for funeral expenses is not affected by any remittitur.

In all other respects, the motion for a new trial is denied.

Plaintiffs' motion to apply North Carolina law on the Rule 59 motion is denied.

Plaintiffs' motion to strike the affidavits of a juror and two private investigators is granted, in part, and denied in part.

IT IS SO ORDERED.