Lewis R. ROBINSON, Nancy D. Robinson, Darwin T. Turnbull, III, as personal representatives of the Estate of Julia Ann Turnbull, deceased, an Oklahoma citizen, Plaintiffs–Appellees and Cross–Appellants,

v.

MISSOURI PACIFIC RAILROAD COMPANY, doing business as Union Pacific Railroad Company, a Delaware Corporation, Defendant–Appellant and Cross–Appellee.

Nos. 92–6099, 92–6112.

United States Court of Appeals,
Tenth Circuit.

Feb. 15, 1994.

A. Camp Bonds, Jr. of Bonds, Matthews, Bonds & Hayes, Muskogee, Oklahoma (Tom R. Cornish of White, Coffey, Galt & Fite, Oklahoma City, Oklahoma, with him on the brief), for Defendant–Appellant/Cross–Appellee.

Jerry Kirksey of Jerry Kirksey & Associates, Edmond, Oklahoma and John E. Vitali of Hornbeek, Krahl & Vitali, Oklahoma City, Oklahoma, for Plaintiffs–Appellees/Cross–Appellants.

Before BALDOCK, BRIGHT,* and McWILLIAMS, Circuit Judges.

BRIGHT, Senior Circuit Judge.

Julia Ann Turnbull, the driver of a 1979 Chevrolet Impala, and her infant son Darwin Turnbull IV, were killed when the Chevrolet collided with a Missouri Pacific ("MoPac") freight train at the gate- and light-protected McKennon Street crossing in Calera, Oklahoma. The respective personal representatives, Darwin Turnbull III for the mother and Lewis R. and Nancy D. Robinson for the infant ("the Turnbulls"), severally brought wrongful death actions against MoPac.

---

* The Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

Car passengers Dawn Barnett and her two young children were also killed in the accident. The surviving husband and father, Ricky Barnett, brought actions for wrongful death against MoPac. The district court consolidated the three cases, but MoPac settled the Barnett cases, leaving for trial only the cases on behalf of Julia Ann's estate and Darwin IV's estate.

After a five-day trial, the jury awarded Darwin IV's estate $250,000 and Julia Ann's estate $200,000. The jury also found MoPac 70% at fault and Julia Ann 30% at fault, thus proportionately reducing the recovery of Julia Ann's estate to $140,000. Post-trial, MoPac renewed its motion for judgment as a matter of law under Fed.R.Civ.P. 50 or, in the alternative, a new trial under Rule 59, and also moved for contribution on the settled Barnett claims[1] and on the jury award stemming from Darwin IV's death. The trial court denied MoPac's motion for judgment as a matter of law and its motion for a new trial. Thereafter, the district court granted MoPac's motion for contribution, ordering Julia Ann's estate to contribute 30% ($75,000) to the recovery of Darwin IV's representatives.

The trial court entered judgments consistent with the jury verdicts and the post-trial orders. MoPac brings this appeal from the judgments, reasserting its entitlement to judgments of dismissal as a matter of law or that because of trial errors, principally, evidentiary matters, the trial court should have ordered a new trial.

The Turnbulls cross-appeal, asserting that the district court erred in granting MoPac's motion for contribution on Darwin IV's claim on grounds that the Oklahoma doctrine of parental immunity bars contribution to a joint tortfeasor for a parent's negligence to a child.

We now affirm the judgments of the district court on MoPac's appeal and on the cross-appeal.

## I. BACKGROUND

At approximately 7:00 p.m. on the evening of October 31, 1989, Julia Ann Turnbull's Chevrolet, travelling westbound, collided with a southbound Missouri Pacific train at the McKennon Street crossing in Calera. Julia Ann Turnbull, her son Darwin IV, and the Barnetts were killed. The wreckage showed that the car ended up approximately 2000 feet south of the crossing, having been pushed straight down the track by the train.

At trial, the plaintiffs presented the theory that the failure of the gates to lower at the proper time allowed Julia Ann Turnbull to enter the crossing despite the oncoming train. Specifically, the Turnbulls argued that the train struck the Chevrolet at a perpendicular angle, the only angle consistent with the train pushing the car straight down the tracks. To support their theory, the Turnbulls called two Calera policemen who arrived at the scene shortly after the crash, Guy Davis who testified to a near-miss at the same crossing six days earlier, two MoPac employees, and expert witnesses Pipkin and Gouty.

Pipkin's opinion testimony also countered the defense theory that Julia Ann had driven around the gates when he opined that the train struck the car at a perpendicular angle and that the angle of impact served to reject any drive-around-gate theory. During Pipkin's testimony, the Turnbulls introduced into evidence and exhibited to the jury a video animation prepared by Pipkin which illustrated Pipkin's opinion and the Turnbulls' theory of the crash. Signals expert Paul Gouty, whose qualifications are disputed, testified that some part of the signal system must have failed to operate properly on the night of the crash.

MoPac contended that its train struck Julia Ann Turnbull's car at a sharp angle while she tried to drive around the lowered gates. The sharp angle collision, according to MoPac, was not inconsistent with the car's final position because the engine and car were locked together. MoPac argued that because its crossing arms and signal unit worked properly, Julia Ann alone was negligent in causing the accident.

---

1. The district court's order granting contribution against Julia Ann's estate for 30% of the Barnett settlement has not been appealed.

MoPac presented the eyewitness testimony of Danny and Stacy Noltkamper, who occupied another car about two blocks away from the crossing, and testified to seeing a car (presumably Julia Ann Turnbull's) drive around the gates and into the crossing. Donna Naramor, whose home is directly opposite the crossing, heard the train whistle sound and saw the reflection of the red flashing crossing arm lights before hearing the thud of the crash. Members of the train crew testified that although their view was limited, they saw the gates down before the train reached the crossing. MoPac also presented the testimony of MoPac circuit design engineer Jim Murphy, who testified that the signal system operated properly, and accident reconstruction expert Sylvanis Walker, who concluded that Julia Ann Turnbull drove around the lowered gates and that the train struck the car at approximately a 17 degree angle (17 degrees clockwise from the east-west line of the street).

We consider first MoPac's appeal. As to evidentiary matters, MoPac contends the district court erroneously failed to exclude (1) a video animation of the accident introduced through expert A.O. Pipkin; (2) Guy Davis' testimony concerning a near-miss at the same crossing; (3) testimony concerning MoPac's operating rules; and (4) expert Paul Gouty's opinion on what caused the accident. MoPac also argues the district court erred in refusing to remove juror Gloria Counselman for cause, and in denying MoPac's motion for judgment notwithstanding the verdict.

## II. EVIDENTIARY ISSUES

■ The admission or exclusion of evidence lies within the sound discretion of the trial court and cannot be reversed absent an abuse of discretion. *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1099 (10th Cir.1991).

### A. The Video Animation

MoPac contends that the district court erred by admitting into evidence, and allowing the jury to view, the videotape prepared by Pipkin. Although the issue is a close one, we reject the claim of error in the circumstances of this case.

■ Pipkin created the video by first making a scale model of the accident scene. He based the model on his examination of the physical evidence, photographs of the wreckage, and observations made during visits to the crossing. Pipkin's model included a train and car which could be moved, along with crossing gates, structures and shrubs simulating the immediate surroundings. Pipkin then had the video camera track the scene every $\frac{1}{10}$ of a second as he moved the model vehicles by hand. In making the tape, Pipkin moved the train at a scaled speed of 49 m.p.h., as testified to by Engineer Potts, and the car at a comparative speed of 13 m.p.h., a speed selected randomly based on Pipkin's opinion that the car could not have been going more than 20 m.p.h. The simulation resulted in a dramatic two-minute silent color video which first depicts the Turnbulls' theory—car enters crossing with gates up and is struck broadside by the train, then MoPac's theory—car weaves around lowered gates and is hit by the train. In the videotape's "gates-up" scenario, the car is pushed straight down the track. In the "gates-down" scenario, the car spins off the tracks in a southwesterly direction. Prior to the jury's viewing of the tape, Pipkin explained that he prepared the models and thereafter fashioned the videotape by incrementally moving the train and car. The Turnbulls offered Pipkin's video for the purpose of illustrating their expert's theory of the accident. The trial court instructed the jury:

Again, I want to emphasize to you that you're not to take this as a recreation of the accident because there's no way that a year or two years after the fact that an accident could be recreated.

The only reason this is shown is that the witness will testify about certain principles that he feels that this video would show to the jury and perhaps it would be helpful to you. So just bear in mind that you cannot recreate an accident.

(Tr. of Proceedings (5/15/91) at 25.)

Following the showing to the jury, Pipkin testified to his conclusion—that the impact occurred at a perpendicular angle—and his foundation for that conclusion. Pipkin testi-

fied without objection to the following opinion relating to the accident:

Q [Mr. Kirksey, Darwin Turnbull, III's attorney]. Why is a 90 degree angle impact significant or that the car was straight over on the road?

A. Well, this wreck only happened one of two ways; either the car went around the gates or the gates weren't up when the lady went across. If it was a perpendicular impact and the gates were down she would have to break one of the gates off. It's that simple.

(*Id.* at 47.)

The animation's first scenario shows the vehicle entering the track area at a 90 degree angle (meaning perpendicular to the train) when struck by the model engine. This scenario conforms with the expert's opinion on the angle of impact, the theory that the vehicle entered the track area with the gates up, and the physical fact that the vehicle came to rest butted against the train approximately 2000 feet beyond the intersection.

MoPac's objections to certain missing or inaccurate details—for example, lights on the crossing sign, sound, unproven vehicle speeds—do not bear on the purpose of the exhibit which was to illustrate the expert's theory. The trial judge did not err in admitting the first scene of the animation as a matter within his discretion [2] and in light of his cautionary instruction to the jury. The cases in this circuit support affirmance of the district court's ruling relating to the animation as illustrative of the expert's testimonial theory of the accident. *See Brandt v. French,* 638 F.2d 209, 212 (10th Cir.1981) (Where an experiment is offered for demonstrative purposes only, the trial judge should make "clear to the jury that even though there is not similarity to the events of the accident that the information is received on a theoretical basis for the limited purpose for which it is offered."). *See also Gilbert v. Cosco, Inc.,* 989 F.2d 399, 402 (10th Cir.1993) ("experiments which purport to recreate an accident must be conducted under conditions similar to that accident, while experiments which demonstrate general principles used in forming an expert's opinion are not required to adhere strictly to the conditions of the accident.").

■ The second portion of the tape raises a more difficult problem as to admissibility. That scenario depicted the collision with the westbound car crossing the tracks with its front angled north toward the approach of the train; at impact the vehicle rotated clockwise and spun off the track a short distance southwest of the crossing.

This portion of the tape, according to the expert, "shows the car if, in fact, it had went around the gates." (Tr. of Proceedings (5/15/91) at 26.) Thus, the theory goes, the physical fact that the train pushed the car straight down the tracks shows the car must have been hit on the perpendicular, because the car would have spun off the tracks to the southwest if it had been struck at an angle.

This theory ignores that on impact, the violent crash may have impaled the vehicle on the front plow of the train, making it impossible for the vehicle to spin off the track. The theory as illustrated by the animation would, however, illustrate the movement of an angled car hit by a train but not impaled by the train on impact.

Appellant did make an additional objection to this part of the videotape to which the record refers as the second scenario,[3] by stating: "It is a staged deliberate moving of the car to the right. It implies that that's what would happen in nature and it just does not. I feel it is highly prejudicial particularly the one with the angle. I just don't think it should be shown." (Tr. of Proceedings

---

**2.** Indeed, at a pretrial conference on MoPac's motion to exclude the videotape animation, MoPac's counsel conceded that the admissibility fell within the court's broad discretion. During the discussion, the trial judge stated: "If you wish to pursue it, I'll be glad to look at the film and hear the expert before the jury does. But, you know, if there is expert testimony to support what is in the film, I would be inclined to let it be shown.

I'll be glad to watch it and hear your objections." (Tr. of Pretrial Proceedings at 24–25.) No further record of any viewings has been presented to us.

**3.** A third scenario, relating to accident avoidance, was ruled inadmissible at a hearing in limine.

(5/15/91) at 24–25.) This objection invokes Fed.R.Evid. 403, which gives the district judge considerable discretion to evaluate whether the probative value of the offered relevant evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403.

Given the limited, solely illustrative purpose for introducing the exhibit, the cautionary instruction to the jury, and the opportunity for vigorous cross-examination, we do not believe the district court abused its discretion in admitting the second scenario.

Moreover, whatever undue prejudice might have existed in the initial admission of this second scenario clearly did not survive the entire trial. Defense expert Walker later clearly explained to the jury his opinion that on impact, regardless of angle, the train and car would have become locked together, causing the train to push the interlocked vehicles south on the tracks to their ultimate stopping point. Moreover, the verdict itself, which attributed some fault to the driver of the vehicle, indicates that the jury did not fully accept the animation scenes as a recreation of the accident.

Having determined that the district court did not abuse its discretion, we add some additional comment. Video animation adds a new and powerful evidentiary tool to the trial scene. McCormick's work on evidence observes that with respect to one party's staged reproduction of facts "not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit ..." 2 *McCormick on Evidence* 19 (4th ed. 1992) (footnote omit-

ted).[4] Because of its dramatic power, trial judges should carefully and meticulously examine proposed animation evidence for proper foundation, relevancy and the potential for undue prejudice. Normally, the trial judge should review the video outside of the jury's hearing. *Brandt v. French,* 638 F.2d 209, 212 (10th Cir.1981). Courts in appropriate circumstances may permit demonstrative use of audio or visual presentations which may assist the jury. *Datskow v. Teledyne Continental Motors Aircraft Prods.,* 826 F.Supp. 677 (W.D.N.Y.1993).[5]

The Supreme Court's recent opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), reinforces the trial court's special role as gatekeeper with respect to expert evidence and opinion. *Cf. Datskow,* 826 F.Supp. at 683 (discussing admissibility of accidentologist's testimony).

Commenting on Fed.R.Evid. 702 and the admission of scientific testimony in *Daubert,* Justice Blackmun stated that

> the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
>
> ... The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.

*Daubert,* —— U.S. at ——, 113 S.Ct. at 2795.

In the case before us, the expert has, in part, based his opinion on the science of physics. In cases presenting opinions grounded in science, as observed in *Daubert,* the trial judge assumes a most important function relating to expert scientific testimony:

> Although defendant argues that there is no practical difference between recreating an accident and re-creating an expert's theory of the accident, the difference is both real and significant; it is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's *opinion* of what happened. So long as that *distinction* is made clear to them—as it was here—there is no reason for them to credit the illustration any more than they credit the underlying opinion. (emphasis in original).

*Datskow,* 826 F.Supp. at 686.

---

4. It is worthy of some notice that the jury, which viewed the videotape, held MoPac 70% at fault for the accident, notwithstanding five eyewitnesses to the accident, two of whom testified Julia Ann drove around the gates. The expert opinion evidence for plaintiffs appears to have carried more weight than eyewitness testimony.

5. In *Datskow,* the district court permitted an expert to exhibit to the jury an animation illustrating his theory on how an airplane fire started. The court distinguished between an illustrative presentation and an impermissible recreation:

[T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review.

*Id.* at ——, 113 S.Ct. at 2796 (footnotes omitted).

Here, the physical phenomena of crash movements may be explained on scientific principles but an argument can be made that it is outside scientific knowledge to opine in a crash such as this one that a car struck at an angle will necessarily leave the railroad tracks on impact.

Concerning future similar issues under Rule 702, we suggest that as "gatekeeper" the district court carefully and meticulously make an early pretrial evaluation of issues of admissibility, particularly of scientific expert opinions and films or animations illustrative of such opinions. Recent amendments to the federal discovery rules will permit an early and full evaluation of these evidentiary problems.[6]

In considering proposed evidence based on scientific and technical evidence, the trial judge should observe that the evaluation under Fed.R.Evid. 702 is a flexible one and "[i]ts overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797.[7]

## B. Guy Davis' Testimony

MoPac next asserts that the district court improperly permitted into evidence Guy Davis' testimony concerning a near-miss collision at the McKennon Street crossing six days before the Turnbull crash. MoPac objected to Davis' testimony at trial in a somewhat nonspecific objection of "different accident." (Tr. of Trial (5/14/91) at 112.)

"[E]vidence of similar accidents involving the same product is admissible under ... federal law to establish 'notice, the existence of a defect, or to refute testimony given by a defense witness that a given product was designed without safety hazards.'" *Johnson v. Colt Indus. Operating Corp.,* 797 F.2d 1530, 1534 (10th Cir.1986) (quoting *Rexrode v. American Laundry Press Co.,* 674 F.2d 826, 829 n. 9 (10th Cir.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982)). Although *Johnson* and *Rexrode* concerned similar "accidents" arising in the products liability context, introduction of evi-

---

**6.** Under amended Fed.R.Civ.P. 26, which took effect December 1, 1993, all parties and the court should possess full information well in advance of trial on any proposed expert testimony or demonstrative evidence. Rule 26(a)(2) ("Disclosure of Expert Testimony") now requires all parties to disclose to their adversaries the identity of any person who may testify at trial under Rules 702, 703, or 705. The amended Rule further requires each expert witness to prepare a report, which

> shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; *any exhibits to be used as a summary of or support for the opinions;* .... (emphasis added)

Fed.R.Civ.P. 26(a)(2)(B). Rule 26 disclosures are normally to be made at least 90 days before trial, and are to be supplemented if appropriate.

Moreover, amended Rule 16 of the Federal Rules of Civil Procedure includes as a subject for consideration at pretrial conferences "the possibility of obtaining ... advance rulings from the court on the admissibility of evidence." Fed. R.Civ.P. 16(c)(3).

**7.** The same flexibility should inform the trial court's consideration of objections to scientific evidence. In addition to objections based on lack of relevancy or reliability, other possible grounds to exclude computer simulations and animations and the like, are lack of authentication (Fed.R.Evid. 901(a)); hearsay or lack of foundation when computer software developer has not testified (Fed.R.Evid. 801); and undue prejudice as an attempted reenactment (Fed. R.Evid. 403). *See Perma Research & Development Co. v. Singer Co.,* 542 F.2d 111, 124–26 (2d Cir.) (Van Graafeiland, J., dissenting), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976) and M. Bright and R. Carlson, *Objections at Trial,* pp. 45–49 (Butterworth Legal Publishers, rev. ed. 1993).

dence of a prior *near-accident* under similar circumstances should be considered under the same legal rubric.

■ Here the Turnbulls elicited Davis' testimony to show that MoPac knew or should have known of a signal defect at the crossing, and to create an inference that the same defect in the signal system caused both the Davis incident and the Turnbull accident. Despite MoPac's assertions to the contrary, the circumstances surrounding the incidents were substantially similar, considering the Turnbulls' theory of the crash. *See Ponder v. Warren Tool Corp.*, 834 F.2d 1553, 1560 (10th Cir.1987) ("In determining whether accidents are 'substantially similar,' the factors to be considered are those that relate to the particular theory underlying the case."). The Turnbulls allege that the gates failed to come down at the proper time, thereby allowing Julia Ann Turnbull to enter the intersection without notice of the approaching train. Davis testified that the failure of the gates to lower sooner caused his near-miss. The incidents have sufficient similarity to withstand the challenge to the evidence. The record does not establish that the probative value of Davis' testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury under Fed.R.Evid. 403. Because the Rule 403 requirements for rejecting the evidence have not been met, we cannot say the trial judge abused his discretion by allowing Davis' testimony.

### C. Paul Gouty's Testimony

MoPac next contends the district court erred by allowing Paul Gouty, the Turnbulls' signals expert, to testify. MoPac objected to his lack of credentials, and to testimony which it considered overly speculative.

Federal Rule of Evidence 702 provides the standard for the admissibility of expert testimony in federal court:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Doubts about whether an expert's testimony will be useful "should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough ... to ignore what is unhelpful in its deliberations." J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 702[02], p. 702–30 (1988) (internal citations omitted).

■ After carefully reviewing MoPac's objection to Gouty's credentials, we find no prejudicial error in the district court's decision allowing him to testify. As to the substance of Gouty's testimony, including his conclusion that the gates did not work properly on the night of the crash, "[t]he burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion." *International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 544 (1st Cir.1988). *See also Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir.1980), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). MoPac conducted a lengthy and probing cross-examination which demonstrated Gouty could not point to any specific defect in MoPac's signal units. Nevertheless, Gouty's opinion did have some basis in fact, at least insofar as his unrebutted statement, that "the information [on this HXP] tape [8] is not valid, it doesn't agree with what the actual conditions are" (Tr. of Proceedings (5/14/91) at 17), supported his conclusion that some part of the signal system may not have worked properly at the time of the incident (*Id.* at 12).

The district court properly overruled MoPac's belated initial objection to the above opinion of Gouty as lacking factual foundation. The witness had already answered before the objection was interposed. Moreover, after the witness later stated at length the basis for his opinion, MoPac made no motion to strike the testimony. Finally, Mo-

---

8. The HXP (or Harmon Crossing Processor) is an electronic device which, using a signal point 2640 feet from the crossing, tells the lights and gates when to come on. (Tr. of Proceedings (5/14/91), testimony of Mr. Gouty, at 11.)

Pac failed to introduce credible evidence contradicting Gouty's opinion about the disparity between the train speed registered on the recording device and the actual speed as testified to by the train's engineers. (See testimony of Sylvanis Walker, Tr. of Trial (5/16/91) at 221–223.)

Even if Gouty's testimony lacked adequate foundation, in light of its overall weakness in adding to plaintiff's case, we would not reverse; for the error, if any, was harmless.

### D. MoPac's Rules

■ MoPac contends that allowing testimony concerning its internal policies was likely to confuse the jury on the issue of standard of care because MoPac's rules demand a higher standard of care than the common law. Although MoPac's company rules do not alter the applicable standard of care, they are admissible to show negligence. In a similar case, we allowed into evidence Railroad Association Loading Rules which established a duty of care higher than the ordinary negligence standard. *Fulton v. St. Louis–San Francisco Ry.,* 675 F.2d 1130, 1133 (10th Cir.1982). We stated in *Fulton* that the district court properly allowed the Railroad Association Loading Rules into evidence where the court instructed the jury that the rules were "not admitted as legal standards of duty, but as evidence of the measure of caution which ought to be exercised in situations to which the rules apply." *Id.* MoPac has never alleged an improper jury instruction on the applicable standard of negligence. Moreover, MoPac has demonstrated no prejudice or confusion on the part of the jury. Accordingly, we find no error on this point.

## III. OTHER ISSUES

### A. Failure to Exclude Juror

■ MoPac contends that the district court should have excused juror Counselman for cause. Trial court decisions concerning the seating or excusing of jurors are " 'in the discretion of the trial court, and such decisions will be reversed only where there has been an abuse of discretion.' " *United States v. Bedonie,* 913 F.2d 782, 795 (10th Cir.1990),

*cert. denied,* —— U.S. ——, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991) (quoting *Anderson v. Dun & Bradstreet, Inc.,* 543 F.2d 732, 734 (10th Cir.1976)). After reviewing the record, we determine that given the thorough voir dire of the jury in general, and of Ms. Counselman in particular, the trial court reasonably concluded she could set aside any prior impressions and " 'render a verdict based on the evidence presented in court.' " *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting *Irwin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). The district court did not abuse its discretion by allowing Counselman to serve on the jury.

### B. Denial of Motion for Judgments For Defendant as a Matter of Law

■ After carefully reviewing the evidence in the light most favorable to the plaintiffs, and in light of our holding that the district court made no evidentiary errors, we determine that there existed evidence upon which a reasonable jury could properly have reached its decision. *Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Even though MoPac produced two eyewitnesses who testified to seeing Julia Ann Turnbull drive around the lowered gates, the evidence did not point in only one direction. *See Aguinaga v. United Food & Commercial Workers Int'l Union,* 993 F.2d 1463, 1469 (10th Cir.1993). The physical evidence in particular did not support only one conclusion on causation. Moreover, from the viewpoint of the jury, the eyewitnesses' testimony was partially discredited by the witnesses' admissions that they neither saw nor heard the actual collision. The jury could also have rejected the accuracy of the Noltkampers' testimony because the witnesses viewed the accident in the dark of night from a substantial distance away from the crossing.

## IV. CROSS–APPEAL

■ The Turnbulls contend in their cross-appeal that the district court erred when it granted MoPac's motion for contribution and ordered Julia Ann Turnbull's estate to con-

tribute to the recovery of her son Darwin IV's estate. The district court reasoned that no public policy ground existed upon which to deny contribution under Oklahoma's common law of parental immunity. In this diversity action we review this issue of state law *de novo*, giving no deference to the district court's opinion. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220, 113 L.Ed.2d 190 (1991).

 The precise issue presented—whether the doctrine of parental immunity bars contribution where both the contributorily negligent parent and child die in a vehicular accident—has not been adjudicated by the Oklahoma Supreme Court. Thus, we must determine what the highest court in Oklahoma " 'would probably hold were it called upon to decide the issue.' " *Gilstrap v. Amtrak*, 998 F.2d 559, 560 (8th Cir.1993) (quoting *Hazen v. Pasley*, 768 F.2d 226, 228 (8th Cir.1985)).

Oklahoma's contribution statute states: "When two or more persons become jointly or severally liable in tort for the same injury ... or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them...." 12 Okla. Ann.Stat. § 832(A). The jury found MoPac and Julia Ann Turnbull jointly at fault for the accident. Therefore, the only question remains whether Oklahoma's parental immunity doctrine bars contribution in this case because of the parent/child relationship between Julia Ann and Darwin Turnbull IV.

Oklahoma has generally enforced the doctrine of parental immunity in suits "brought by a minor child for injuries suffered due to a parent's ordinary negligence." *Unah by and Through Unah v. Martin*, 676 P.2d 1366, 1368 (Okla.1984). In *Unah*, however, the Supreme Court of Oklahoma created an exception to the doctrine and permitted a child to recover to the extent of his parent's liability insurance for injuries caused by the par-

ent's negligent operation of a motor vehicle. *Id.* The *Unah* court created the liability coverage exception, overruling several cases which would have barred contribution, because the policy rationales most frequently advanced to support immunity—disturbance of domestic tranquility, interference with parental control, and the possibility of parent-child collusion—failed to furnish grounds for disallowing recovery.[9] Observing that "[p]ublic policy has been the sole justification for adoption and proliferation of the judicially created doctrine of parental immunity," *id.* at 1370, the *Unah* court found the usual immunity rationales hollow in the liability insurance context.

We conclude that Oklahoma's highest court would find the policy grounds for applying parental immunity equally hollow here. Because both mother and child died in the tragic accident, the disturbance of domestic tranquility rationale seems without relevance. Likewise, ongoing parental control is not at issue, nor is there any danger of fraud or collusion between parent and child.[10] Not only would application of the parental immunity doctrine lack a sound policy basis in this factual context, but it would also unfairly force MoPac to pay 100% of Darwin IV's damages even though the jury found MoPac only 70% at fault. Based on our belief that the Oklahoma Supreme Court would find no valid policy grounds upon which to apply the common law immunity in this case, we affirm the district court's order of contribution.

## V. CONCLUSION

Finding no prejudicial error in any of the trial court's rulings, the judgment of the district court is AFFIRMED.

9. Notably, six of the eight judges voted to abrogate immunity in this special context, and three of those six concurred specially in the view that the entire doctrine should be abolished.

10. The *Unah* court also cited two other policy grounds supporting the doctrine: the possibility

of inheritance by the parent of the amount received in damages by the child, and the depletion of family assets in favor of the claimant at the expense of the child. *Unah*, 676 P.2d at 1369. These additional grounds have no relevance to the present case.