2000 OK CIV APP 69

**Kendra LAWSON, Personal Representative of the Estate of Tommy Charles Lawson, Appellee.**

v.

**NATIONAL STEEL ERECTORS CORPORATION, Appellant.**

**No. 91,437.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Feb. 22, 2000.

Certiorari Denied May 9, 2000.

Tom Colbert, Colbert & Associates, Oklahoma City, Oklahoma, Bill Settle, Settle & Landrum, Muskogee, Oklahoma, Kevin Krahl, Hornbeek, Krahl & Vitali, Oklahoma City, Oklahoma, For Appellee.

Michael F. Smith, John H. Tucker, Rhodes, Hieronymus, Jones, Tucker & Gable, P.L.L.C., Tulsa, Oklahoma, For Appellant.

REIF, J.

¶ 1 This appeal concerns the judgment entered upon the jury verdict that found National Steel Erectors Corporation liable for the death of Tommy Charles Lawson. National has contested its liability from the earliest stages of this case to its post-judgment motions for new trial and judgment notwithstanding verdict. National has contended that it has no liability for the fatal accident even though the bucket of concrete that struck and killed Mr. Lawson was being moved by a National crane with a National operator at the controls. National has stressed that the crane and operator had been leased to Mr. Lawson's employer, Manhattan Construction Company, for use "as directed." National points out that it was undisputed that the National crane operator only moved the concrete bucket as directed by hand signals given by a Manhattan supervisor. National has argued that Manhattan had complete control over the crane and operator at the time of the accident which relieves National from liability as a matter of law.

¶ 2 In the alternative, if it was proper for the jury to determine National's liability, National has also argued that the jury did not have adequate guidance on allocating liability. National contends that this error resulted from the trial court refusing to allow National's counsel to discuss allocating liability in closing argument, and in not giving such guidance in response to a question by the jury. National further claims prejudicial error occurred in the admission of plaintiff's "accident reconstruction" video and exclusion of certain medical records of the deceased.

¶ 3 Lastly, if the judgment survives the foregoing challenges, National has argued that it should be reduced. National contends the 1.7 million dollar damage verdict was excessive and that attorney fees and costs were improperly awarded.

I.

¶ 4 National relies on the "loaned servant" doctrine in arguing that it has no liability for the death of Mr. Lawson. The "loaned servant" doctrine provides:

> Servant lent by master to another for particular employment, although remaining general servant of master, must be dealt with as servant of one to whom he is lent, as regards anything done in the latter's employment.

*Smith v. Hall,* 1966 OK 103, ¶ 11, 418 P.2d 665, 669 and syllabus 3 (citing *Wylie–Stewart Mach. Co. v. Thomas,* 1943 OK 83, 137 P.2d 556 (syllabus 2)). In applying the "loaned servant" doctrine,

The controlling factor in determining whether a regular employee of one master has become the special or loaned servant of another is: Has the general employer released, for the time required to perform some particular work, all authority to control or direct the manner and method of the work to be done and surrendered such direction and control to the special [borrowing] employer?

*Smith,* 1966 OK 103, ¶ 13, 418 P.2d at 669 and syllabus 4; *Hodges v. Holding,* 1951 OK 48, 229 P.2d 555 (syllabus 3).

¶ 5 National stresses that the *Smith* case and the *Wylie–Stewart* case hold that the trial court can properly determine the application of the "loaned servant" doctrine as a matter of law. Under these cases, "loaned servant" is a question of law when the factual circumstances concerning the lending of the servant and equipment, and their use by the borrowing employer, are not in dispute.

¶ 6 In response, Mr. Lawson's personal representative argues that a question of law does not always arise simply because there is no dispute about factual circumstances concerning the lending of the employee and equipment, and their use by the borrowing employer. Mr. Lawson's personal representative points out that the *Hodges* case recognizes that a question of fact can exist concerning the application of the "loaned servant" doctrine, if different inferences may be drawn from the undisputed facts.

¶ 7 *Smith, Wylie–Stewart,* and *Hodges* are noteworthy not only for their application of the loaned servant doctrine, but for their application of the loaned servant doctrine to factual circumstances that are closely analogous to the factual circumstances of the case at hand. Like the case at hand, the foregoing cases involve the alleged loaned servant's operation of equipment that his general employer had hired out to the borrowing employer. In *Smith, Wylie–Stewart,* and *Hodges,* the loaned servants had been directed by the borrowing employer to use the hired equipment to move something as part of a larger project. Additionally, like the instant case, the foregoing cases did not involve any serious controversy over the borrowing employer's deployment of the equipment and the alleged loaned servant.

¶ 8 In *Smith,* the loaned servant was operating a winch to move an oil rig substructure. The borrowing employer's supervisor instructed the loaned servant to attach a single loop of cable around the middle of a cross member on the substructure in order to move it. The loaned servant followed the supervisor's instruction even though "he knew this was not safe." The loaned servant followed this instruction because he "didn't have the authority to tell them" to use a different type of hook-up. 1966 OK 103, ¶ 7, 418 P.2d at 668.

¶ 9 In the *Wylie–Stewart* case, the loaned servant was operating a power shovel to load rock into trucks for removal. The borrowing employer's supervisor "exercised close control ... giving orders as to the position of the shovel, its procedure for loading the trucks, and ... the route and routine of the trucks as they approached the shovel to be loaded." 1943 OK 83 at ¶——, 137 P.2d at 560. The supervisor "gave his directions by hand signs." *Id.* Due to "the way the rock had been dynamited and the manner in which it lay, it was necessary to place the shovel in a position with respect to the rock ... and the trucks that had not been theretofore used." *Id.* Likewise, "it was necessary to have the trucks approach the shovel in a position not theretofore used and not as safe or desirable as the other approach." *Id.* The supervisor "had been taking extra precautions when having the loaded and emptied shovel moved over the trucks." *Id.* The accident that formed the basis of the suit against the regular employer of the loaned servant occurred because the loaned servant "violated [the supervisor's] instructions" by swinging the shovel over the cab of a truck. *Id.*

¶ 10 In the *Hodges* case, the loaned servant was operating a truck with a winch to move drilling equipment from its location around a well up to the well, and unloading it wherever directed. In response to a direction by the borrowing employer's supervisor to bring certain equipment to the well, the loaned servant began backing the truck toward the ordered equipment. In backing the truck, the loaned servant struck another

employee of the borrowing employer. The court observed that the borrowing employer "had the authority to give orders" to the extent that the borrowing employer "knew when certain equipment was needed and where it was needed." 1951 OK 48 at ¶——, 229 P.2d at 558. However, the borrowing employer "did not have the authority to tell [the loaned servant] how to drive the truck or how to use the winch or gin pole." *Id.* The only directions given by the borrowing employer to the loaned servant about "how to operate [the] winch and gears that operated it" consisted of "tell[ing] him to pick [an object] up a little higher or let it down, or whatever they wanted done with it." *Id.*, 229 P.2d at 559. Under such circumstances, the supreme court concluded that the general employer's liability for the negligence of its "loaned" employee was a jury question.

¶ 11 A common point between the *Smith* case and the *Hodges* case is their emphasis on the requirement that the regular or lending employer surrender "full control" over the loaned servant. The *Smith* case states:

> [I]f the general employer has not resigned full control of the servant for the time during which the work is being performed, then the servant does not become the servant of the person for whom the work is performed merely because such person points out the work to the servant or gives him directions as to details of and manner of doing the work.

1966 OK 103 at ¶ 15, 418 P.2d at 669–70 (citation omitted). The *Hodges* case similarly states:

> To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person.

1951 OK 48 at ¶——, 229 P.2d at 559 (citation omitted). The *Hodges* case further states that if the original master "does not surrender full control over the servant, he remains liable for his negligence during the time he acts for the person to whom he is loaned." *Id.*

¶ 12 The *Hodges* case notes that the requisite "full control" is "authoritative control" and not "mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation." *Id.* The *Hodges* case further observes:

> A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out the work to the servant, or gives him signals calling the service into activity, or gives him directions as to the details of the work and the manner of doing it.

*Id.*

¶ 13 The reason that the loaned servant doctrine was applied as a matter of law in the *Smith* and *Wylie–Stewart* cases was the undisputed fact that the borrowing employer in each case exercised "authoritative control" over the loaned servant concerning the operation of their equipment. The borrowing employer in each case directed the operation of the equipment in ways that created the danger from which the accidents and injuries arose. In contrast, the borrowing employer in *Hodges* merely directed the loaned servant to move certain equipment up to the well and did not tell the loaned servant "how to reach the equipment he had been ordered to bring to the well." 1951 OK 48 at ¶——, 229 P.2d at 558.

¶ 14 In the instant case, it cannot be said that the borrowing employer, Manhattan Construction Company, exercised "authoritative control" over the loaned crane operator in the same way as the borrowing employers in the *Smith* and *Wylie–Stewart* cases. Also, different inferences can be drawn from the undisputed facts about whether National surrendered "full control" of the operator and crane to Manhattan.

¶ 15 The circumstances of the instant case are more like those of *A.K. McBride Constr. Co. v. Arkhoma Steel Erection Co.*, 1959 OK 196, 348 P.2d 541, where the supreme court held the application of the loaned servant doctrine was a question of fact. The record in the *A.K. McBride* case revealed that A.K. McBride Construction rented a machine to Arkhoma Steel to pick up, move, and set some tanks. A.K. McBride Construction fur-

nished the operator of the machine and paid him. The operator of the machine successfully moved two tanks with the assistance of riggers who worked for Arkhoma Steel. While moving a third tank, the machine toppled and fell. In holding that the application of the loaned servant doctrine was a question of fact, the court observed that (1) the operator had complete and exclusive control of the machine and operation thereof; (2) the riggers who assisted the operator used hand signals and "spottèd" the machine where the tank could be picked up; (3) after securing lines to a tank, the riggers gave hand signals to the operator to pick the tank up and then directed him where to set it; (4) at no time did any of the riggers have anything to do with the operation of the machine.

¶ 16 In the instant case, (1) the National crane operator had complete and exclusive control of the crane; indeed, no one was permitted in the cab of the crane except the National operator; (2) even though employees of Manhattan used hand signals to direct the movement of the cement bucket from where it was filled to the place where it would be poured, and back to the fill site, none of Manhattan's employees had anything to do with the operation of the crane; (3) the hand signals were "signals calling the service into activity" and provided "the necessary cooperation [to complete] a larger operation;" they were more like the directions in *Hodges,* 1951 OK 48 at ¶——, 229 P.2d at 559, "to pick [an object] up a little higher or let it down, or whatever they wanted done with it;" they were nothing like the controlling, precautionary directives given in *Wylie–Stewart,* 1943 OK 83 at ¶——, 137 P.2d at 560, to load trucks with a power shovel in a way "not as safe or desirable as the other approach;" (4) the National crane operator decided where the crane should be positioned, whereas in *Wylie–Stewart, id.,* the borrowing employer's supervisor gave "orders as to the position of the shovel;" (5) the National crane operator decided how full the bucket should be, whereas in *Wylie–Stewart, id.,* it was the borrowing employer's supervisor who gave "orders as to [the shovel's] procedure for loading the trucks" (which included "extra precautions when having the loaded and emptied shovel moved over the trucks"); in

*Smith,* it was the borrowing employer's supervisor who instructed the loaned servant to employ the unsafe procedure of attaching a single loop of cable on a cross member to move the substructure of an oil well; and (6) it was National, and not Manhattan or its supervisor, that provided a crane with broken safety features for him to operate.

¶ 17 The foregoing factors do not conclusively establish National's liability nor automatically negate National's loaned servant defense. They do demonstrate, however, that the loaned servant defense cannot be decided as a matter of law. Accordingly, we find no error by the trial court in submitting this question to the jury.

¶ 18 National makes no complaint about the instructions that the trial court gave the jury concerning National's loaned servant defense and National's liability in general. In reviewing the instructions on these issues in light of the record as a whole, we find no fundamental error in the instructions and no other reason to disturb the jury's resolution of these issues against National.

## II.

■ ¶ 19 National alternatively argues that the jury did not have adequate guidance to determine the degree of any liability that National may have for Mr. Lawson's death. National contends that the inadequacy of the instructions did not become apparent until National's counsel began his closing argument and attempted to address the issue of allocating liability. National specifically complains about the trial court sustaining an objection to the attempt by National's counsel to explain allocating liability in closing argument. National also asserts that the fundamental inadequacy of the instructions on the issue of allocating liability, and the jury's confusion on this issue, was clearly demonstrated by a note that the jury submitted to the judge during deliberations.

¶ 20 In the course of closing argument, National's counsel attempted to explain allocating liability between Mr. Lawson, National, and Manhattan. National's counsel premised his discussion by stating "[a]nd you can get this out of the instructions, if you read it,

but with all respect to the Court, the instructions are kind of difficult to follow." After National's counsel gave the jury a hypothetical example of applying the jury instruction, counsel for Mr. Lawson's personal representative objected on the ground "[h]e's telling them more than what the law requires or O.U.J.I. requires ... [t]hat's more instructions on the law ... [t]he court's the entity that does that, not the lawyers."

¶ 21 When the court indicated that the hypothetical explanation "seems ... to be a departure from the spirit of the instructions that the Court has given," National's counsel indicated that he would "just move on from that and talk about comparative negligence ... and make no further reference to the hypothetical." Before allowing National's counsel to continue closing argument, however, the trial court gave the jury an additional charge on the subject of allocating liability. National's counsel did not object to the additional charge.

¶ 22 The hypothetical posed by National's counsel did expand upon the instructions to the jury. Where counsel believes that instructions are inadequate, the proper course is to request additional instruction by the court and *not* for counsel to undertake such additional instruction by way of argument. "In jury trial, argument of counsel should be limited to those questions submitted to the jury and should not extend to questions of law determinable by the court." *Grand River Dam Authority v. Grand–Hydro*, 1947 OK 167, 201 P.2d 225 (syllabus 4). In the instant case, the court gave an additional instruction without an objection from National's counsel. Accordingly, the trial court did not err in sustaining the objection to counsel's hypothetical concerning allocation of liability or in providing additional guidance on this issue.

¶ 23 National contends that the inadequacy of the instructions on allocating liability is further demonstrated by (1) a note submitted by the jury during deliberations, and (2) a post-trial meeting between the court and three jurors who sought to explain the jury's allocation of liability. National believes that the trial court erred in the response it gave to the jury's note and should

have granted National a new trial when the jury confusion became clear.

¶ 24 In their note, the jury indicated that they had voted 10–2 that both National and Manhattan were responsible, but indicated that they did not want to sign the blue verdict form without both parties on the form. The record reflects that the court shared his interpretation of the note with counsel:

So, what they're saying, I think, is that we don't find that the plaintiff is negligent to any extent, whatsoever. But they don't want to return a blue form without an indication that Manhattan is culpable in this along with the defendant.

When the court stated: "I can sure put Manhattan on the blue form," National's counsel responded:

Your Honor, I'd have a very serious objection to that. All the law you're supposed to give them, you already gave them. And the effect of the blue form, the effect of joint responsibility of Manhattan is specifically addressed in your instructions.

Counsel for National further stated:

Your Honor, *I suggest that you look at unnumbered instruction which is the instructions on how to use the blue verdict form,* and would suggest that the jury be referred to the instructions for using any verdict form, and if further instruction is required, it would be to look at the instructions on how to fill out the verdict forms. (Emphasis added.)

¶ 25 The trial court ultimately responded to the jury's note with the following written direction:

Consult O.U.J.I. 9.26 blue verdict form for plaintiff non-party involved directions.

As it directs, if the occurrence was directly caused by the negligence of defendant, or of both defendant and Manhattan Construction Company, and not by any contributory negligence on the part of the decedent, then you shall use the blue verdict form.

It does not matter that Manhattan is not named on the form.

¶ 26 National's only objection to this directive was that the trial court referred the jury *only* to instructions for using the blue verdict form. National's counsel felt that the direction singled out the blue form. National's counsel recommended that the jury be referred back to the instructions on all verdict forms.

¶ 27 The jury's note addressed the use of the blue verdict form. This is the *only* subject upon which the jury sought clarification. The jury did not indicate that they had any problems in understanding the other verdict forms or the instructions for using those forms. Under such circumstances, the trial court did not err by limiting his response to the narrow inquiry of the jury's note. Given the jury's notice that they had voted 10–2 that both National Steel and Manhattan are responsible, and their choice of the blue form, we do not believe that the trial court's limited response singled out or improperly suggested that the blue verdict was the verdict that the jury should return. The trial court simply addressed the subject upon which the jury sought clarification and we find no error in this.

¶ 28 Lastly, the fact that three jurors gave an explanation of the verdict after the trial and their discharge cannot be considered by either the trial court for purposes of new trial, or this court on appeal. It is well settled that jurors will not be heard by affidavit, deposition, or other sworn statements to impeach or explain their verdict, or show on what grounds it was rendered. *Willis v. Davis,* 1958 OK 288, ¶ 24, 333 P.2d 311, 314.

### III.

¶ 29 National also claims that the trial court made evidentiary rulings that were prejudicial to the point that the trial court should have granted a new trial. National specifically complains about the exclusion of certain past medical records of Mr. Lawson and the admission of plaintiff's "accident reconstruction" video.

¶ 30 National argues that the past medical records were relevant to show the "earning capacity, health habits, and probable dura-tion of the decedent's life." National notes that those are factors for determining pecuniary loss under Oklahoma's wrongful death statute and were factors upon which the jury was instructed. National also contends that the medical records were relevant to "refute" or "challenge Plaintiff's [economic] expert's assumption that decedent had a normal life expectancy."

¶ 31 The record reflects that the trial court granted a motion in limine to exclude the records in question. However, we find no instance at trial where National made an offer of proof to preserve this issue for appeal. "If the evidence is excluded by an in limine ruling, the party seeking to introduce it must at trial—out of the hearing of the jury—make an offer to show for the record the essence of testimony sought to be elicited. In this manner the trial court is afforded an opportunity to make its in-trial ruling upon the issue in contention. It was incumbent upon the [party] to make an offer of proof in order to preserve the error for our review." *Braden v. Hendricks,* 1985 OK 14, ¶¶ 9–10, 695 P.2d 1343, 1348–49 (footnotes omitted).

¶ 32 As concerns the admission of the computer animation video, we likewise find no reversible, prejudicial error. Mr. Lawson's personal representative offered the video "to help illustrate [the expert's] opinion." At the time it was offered, the trial court viewed the video out of the presence of the jury and allowed National's counsel to specify objections to various matters depicted in the video. After viewing the video and considering the objections, the trial court stated:

> In my view, it is sufficiently accurate to be shown to the jury. I do not think its potential to mislead exceeds its value in describing to the jury what these witnesses have been laboring to describe. I think it is more helpful in that the defects that you've described and accurately brought to my attention are such that they would affect only the weight to be given the evidence, and not its admissibility. And I will allow it to be demonstrated to the jury over the defense objection.

¶ 33 Having reviewed the video, we agree with the trial court's assessment. We also agree that an "animation as illustrative of the expert's testimonial theory of the accident" is properly admissible. *Robinson v. Missouri Pacific R.R. Co.*, 16 F.3d 1083, 1087 (10th Cir.1994) (citation omitted). The trial court did not err or abuse its discretion in denying National's motion for new trial on this ground.

## IV.

¶ 34 National has also sought a reduction in the judgment on grounds that the damages were excessive and that the trial court improperly awarded attorney fees and costs.

¶ 35 In rejecting the excessive damages portion of this request, it is sufficient to note that the expert testimony of the economic expert called by Mr. Lawson's personal representative *alone* supports the verdict. It was for the jury to determine the weight to be given such evidence. "A verdict of a jury cannot be set aside as excessive unless it strikes mankind, at first blush, as beyond all measure unreasonable and outrageous and such as manifestly shows it was actuated by passion, prejudice, partiality or corruption." *Strubhart v. Perry Memorial Hosp. Trust*, 1995 OK 10, ¶ 18, 903 P.2d 263, 270 (citation omitted). We cannot conclude that a verdict supported by otherwise competent expert testimony is "beyond all measure unreasonable and outrageous."

¶ 36 Finally, National asserts that the trial court erred in awarding Plaintiff an attorney fee and costs pursuant to 12 O.S. Supp.1997, § 1101.1(A)(4). This statute states:

In the event a defendant rejects the counteroffer(s) of judgment and the judgment awarded to the plaintiff is greater than the final counteroffer of judgment, the plaintiff shall be entitled to recover reasonable litigation costs and reasonable attorneys fees incurred by the plaintiff from the date of filing of the final counteroffer of judgment until the date of the verdict. Such costs and fees may be added

to the judgment entered in favor of the plaintiff.

¶ 37 National rejected plaintiff's pretrial counter-offer of judgment in the amount of $1,799,000.50. After the jury returned a verdict of $1,700,000, the trial court added prejudgment interest and costs of $251,515.86, for a total judgment of $1,951,515.86. This calculation was in accord with the holding in *Bohnefeld v. Haney*, 1996 OK CIV APP 141, ¶¶ 7–8, 931 P.2d 90, 91, whereby the trial court is to receive the verdict, compute the prejudgment interest, and add the interest amount to the verdict amount to arrive at the "judgment" to be rendered against the defendant.

¶ 38 National's argument that the prejudgment interest amount should be added to the counter-offer of judgment amount to determine what the "actual" offer of judgment amount was is unpersuasive and without merit. The plain wording of the statute and the holding in *Bohnefeld* dictate that, without specific words to the contrary, an amount contained in an offer of judgment is inclusive of *all* items of damage which the trial judge would include when rendering judgment.

## V.

¶ 39 We hold that the trial court did not err or abuse his discretion in denying National's motion for new trial, motion for judgment notwithstanding verdict, and motion for remittitur. We affirm the judgment entered on the jury verdict and the award of costs and attorney fees to the personal representative of decedent, Tommy Charles Lawson.

¶ 40 AFFIRMED.

¶ 41 GOODMAN, C.J., and STUBBLEFIELD, J., concur.